Fulton v. Fulton.

---

### DAVID M. FULTON v. REBECCA A. FULTON.

1. CHANCERY: JURISDICTION: DIVORCE.—Proceedings for divorce are, by the constitution and laws of this State, a branch of equity jurisdiction, and are embraced in the provisions of the statute regulating the practice in chancery cases, except when otherwise expressly provided.

2. CHANCERY: APPEAL LIES IN DIVORCE CASE.—The Statute, Rev. Code, pp. 555, 556, §§ 103, 108, provides expressly that an appeal on certain conditions, may

be prosecuted from any final decree, rendered in the chancery court, at any time within three years from the date of its rendition, and there is no exception in this respect in relation to decrees pronounced in suits for divorce, and an appeal is allowable in such cases.

3. HUSBAND AND WIFE : DIVORCE, DESERTION.—A voluntary separation of husband and wife by mutual consent and agreement of both parties, is no ground for granting a divorce to either.   A divorce will not be granted on the ground " of the wilful, continued and obstinate desertion of the defendant for three years," unless it appears that such desertion was without the consent or connivance of the complainant.

4. SAME.—The mere absence of the husband or wife from the matrimonial domicile, without an intent to discontinue the marital relation, is not in a legal sense, a desertion, but such absence becomes a desertion as soon as the absentee abandons the intention of returning.

5. SAME : EFFECT OF OFFER TO RETURN.—To constitute desertion a legal ground for a divorce, it must be continuous and uninterrupted for the space of three years, and hence if there be a return or a proper offer to return by the absentee, within three years before the filing of the bill, a divorce will not be granted.

6. SAME : OFFER TO RETURN MUST BE BONA FIDE WITHOUT IMPROPER CONDITIONS.— An offer to return and resume the matrimonial relation by a husband or wife, who has abandoned the matrimonial domicile, will not put an end to the desertion, unless it be made *bona fide*, and unaccompanied by improper qualifications or conditions, and really intended to be carried out, if accepted.

7. SAME : HUSBAND'S EXERCISE OF RIGHT TO DETERMINE WHO SHALL BE VISITORS AT THE MATRIMONIAL DOMICILE, NO CAUSE FOR THE DESERTION OF WIFE, ETC.— The husband has the perfect legal right to determine who shall be received at the matrimonial mansion as visitors and guests, and who shall be excluded therefrom ; and hence, if in the exercise of this right he prohibits his wife from receiving at that place the visits of her child by a former husband, this constitutes no legal excuse for an abandonment of the matrimonial domicile by her, and if she afterwards offer to return, upon the condition that such visits be allowed by the husband, such offer does not put an end to her desertion.

8. SAME : DIVORCE : WHEN DECLARATIONS OF COMPLAINANT ADMISSIBLE IN HIS FAVOR.—In a suit for a divorce upon the ground of the desertion of the defendant for three years, where there is no ground to suspect collusion between the parties, the declarations of the complainant made to the defendant, about the date of the commencement of the separation, explanatory of the relations subsisting between them, and of the motives upon which the complainant acted, are in the nature of verbal acts, constituting a part of the *res gestæ*, and are admissible in evidence in favor of the declarant.


APPEAL from the Chancery Court of Madison county.   Hon. E. G. Henry, chancellor.

The pleadings and evidence are sufficiently stated in the opinion of the court.

*Yergers* and *Anderson*, for appellant,.

Cited Bishop on Marr. and Div. §§ 513, 514, 525, 526, 306, 309, 310.

*A. P. Hill*, for appellee,

Cited Bishop on Marr. and Div. §§ 511, 515; 3 Richardson, 93; 31 Maine, 342; 8 Watts & Serg. 251; 12 Johnson, 293; 5 Ham. (Ohio R.) 318.

SMITH, C. J., delivered the opinion of the court.

This bill was filed in the Chancery Court for Madison county, by a husband against his wife, for a divorce from the bond of matrimony. The alleged ground for the relief was wilful and obstinate desertion, continued for the period of three years. The answer denied, fully and specifically, the charge of desertion. And at the hearing, upon the bill, answer, and proofs, adduced by both parties, a decree was rendered for the defendant, and the bill was dismissed. The complainant, thereupon, appealed.

A motion to dismiss was pending, when the cause was argued and submitted, which was also submitted at the same time. It is proper, therefore, before entering upon an investigation of the merits, that the grounds for the motion should be examined. These are, that the act, in regard to the proceeding for a divorce, has made no provision, by appeal or otherwise, for a revision of the decree therein pronounced; and that the statute regulating appeals from decrees in chancery does not apply to such a proceeding.

The Statute of 1822, gave to the Court of Chancery, established under the first constitution of this State, full jurisdiction in all cases of divorce, and provided that the like process and proceedings should be had and pursued in such causes, as were had and pursued in other chancery causes, except that the answer of the defendant was not to be under oath. This it was, doubtless, competent for the legislature to do. Hence, when the convention, which adopted the present constitution, assembled, according to the system then prevalent, the power over the subject of divorce was a branch of

the chancery jurisdiction.    It is clear that it was so considered by
the convention.    In fact it is apparent from Art. 4, § 16, of the
Revised Constitution, that matters of divorce were considered and
treated as subjects of equity cognizance; in regard to which, juris-
diction vested in the Superior Court of Chancery under the general
grant of "jurisdiction in all matters of equity."    And such has
always been the construction given to the provisions of the consti-
tution, by which the Superior Court of Chancery was created; and
concurrent equity jurisdiction, in certain cases, conferred upon the
circuit courts.

The 16th section of Art. 4 was abrogated and stricken out, by
which of necessity the Superior Court of Chancery was abolished,
and the concurrent jurisdiction vested in the circuit courts with-
drawn, and in lieu thereof a section, which provides that, " Chan-
cery courts, with full jurisdiction in all matters of equity, shall be
held in each judicial district, by the circuit judge thereof," &c.,
was inserted.    And as no law has since been adopted, with the
object, or the effect of which is, to put in any court, jurisdiction in
cases of divorce, it follows, that, unless jurisdiction in such cases
was given to the chancery courts, by said amendment, it is pos-
sessed by no other.    But we apprehend that the legislature, in
proposing the amendment, and the people when they voted for it,
intended to give to the chancery courts, the same jurisdiction
which then belonged to the Superior Court of Chancery.

It is manifest that the legislature, in prescribing the mode of
procedure in a suit for a divorce, not only considered such a suit as
a proceeding in chancery, but went upon the ground that the courts
of chancery possessed jurisdiction in matters of divorce.    Art. 18,
p. 335, Rev. Code.    It hence follows that, except in cases where
express exceptions have been made, the laws regulating the practice
in the courts of chancery, apply in cases of this character, as in
all other cases.    And the statute organizing these courts and regu-
lating the practice thereof, provides expressly that appeals from
any final decree therein, may be taken in term time, or within three
years after the rendition of the decree, by either party to the suit,
upon complying with the conditions prescribed by law.    Rev. Code,
p. 555, 556; §§ 103, 108.    These directions are too explicit and
imperative for this court to disregard them, and to assume that the

legislature did not intend what they have expressed in very plain terms, and to adopt a different construction, from any view of the injurious consequences which might otherwise ensue. The reasons for the motion are, therefore, untenable.

It is an established and conceded fact, that the appellant and his wife, Mrs. Fulton, were living apart, from the latter part of the year 1854, down to the time of filing this bill, which was the 24th of October, 1857. The alleged desertion, to have entitled the complainant to relief, must, therefore, have occurred as early as the 23d of October, 1854. In view of the facts, and one of the grounds assumed in defence of the decree, it is material to ascertain the true point of time at which the separation commenced.

The facts more directly connected with this question, are as follow. Early in the month of September, 1854, Colonel and Mrs. Fulton were at Cooper's Well, in Hinds county, where they had been staying some time. Mrs. Fulton was then suffering under an attack of typhoid fever, and, at the suggestion of Dr. Harreld, and upon medical advice, she determined to remove from that place; and accordingly went to the house of Dr. Harreld, who lived some miles from Canton, at which place the appellant resided, in a fine and comfortable mansion. She went there on the 6th of September, and remained some two months, and never afterwards returned and took up her residence at the matrimonial mansion. Colonel Fulton had never, during his connection with the appellee, been neglectful of the duties of a husband: he had uniformly treated her with respect, had been kind and affectionate towards her, and attentive and careful of her wants. On the occasion of the removal from the Well, he had made the necessary preparations; and seems to have been under the impression that the appellee was to be removed to their own home in Canton. The expressed object of the appellee, in going to Dr. Harreld's, was to afford him, who was her favorite physician, a better opportunity for treating her disease; and the determination to go there, was made without consultation with the appellant, who, however, when informed of that fact, made no opposition. For some time after she had been removed, and while her illness was considered dangerous, the appellant was attentive, and frequently visited her at Harreld's, although he was laboring under a severe wound. But an event had transpired before the

appellee was removed to Dr. Harreld's, which disturbed their previous affectionate and harmonious relations. At night, while asleep in his bed, a murderous attack was made upon the life of the appellant. The perpetrator of the deed was unknown; but suspicion immediately attached to Samuel L. Montgomery, who was the appellant's step-son, and the only child of Mrs. Fulton. While the latter was staying at Dr. Harreld's, Montgomery was indicted for the offence, by the grand jury of Hinds county; and, whether upon sufficient or insufficient evidence, the appellant was firmly convinced that the charge was well founded; and, acting upon the conviction of Montgomery's guilt, he determined that there should be no further intercourse between him and his family,—that Montgomery should not be permitted to visit his house. Mrs. Fulton, influenced, naturally, by her maternal affection, did not believe that Montgomery had committed the assault. At all events, she was not willing to give up her son, and be deprived of his society.

It is manifest, from the evidence, that the estrangement between the appellant and the appellee arose, principally, if not exclusively, from these causes; and that the matter in dispute between them was, whether Montgomery should, or should not, be allowed to visit their house,—Colonel Fulton declaring that he should not, and Mrs. Fulton claiming the right to receive his visits and to welcome him as a son. And this difference was the immediate cause of the separation; which, it is insisted, must be held to have taken place when the matters between them had arrived at that issue.

It was, unquestionably, the duty of Mrs. Fulton, unless prevented by the appellant, to return to the matrimonial domicile, and to resume the duties of a wife, as soon as a due regard for her health would permit. No question can be raised, as to the perfect legal right of Colonel Fulton, as master of the house, and as husband, to exclude any person from his doors, and to determine as to whom should be received, as a visitor, by the appellee, whether or not the grounds upon which he acted were sufficient to justify him in a moral point of view. In this case, it is manifest, that he did not act from caprice, or a wanton disregard of the wishes of Mrs. Fulton. If he had just grounds for believing that Montgomery, in the manner described, had attempted his life, he was justified, in every point of view, in excluding him from his house, and cutting

off all intercourse with him. In the facts above stated, therefore, no legal justification or excuse can be found for the appellee's continuing to absent herself from home. It would, hence, be manifestly improper to hold, that the separation did not take place until Mrs. Fulton's removal from Dr. Harreld's, which was some time in November; but, obviously, the true time of the separation, was when, in consequence of the appellant's determination in regard to Montgomery, the appellee, being still at Dr. Harreld's, determined not to return home.

But it is insisted that, in point of fact, there was no separation, and, of consequence, there could have been no desertion, on the part of Mrs. Fulton, until some time in November; and the depositions of Dr. and Mrs. Harreld are relied on to sustain this position.

Dr. Harreld testified, that after Mrs. Fulton had been some time at his house,—having been removed there from the Well,—the appellant requested that she might be permitted to stay longer; to which request he assented. No date is assigned to this transaction. The application of the appellant, that Mrs. Fulton might stay longer at Dr. Harreld's, might have been made before the 20th of September, or not until late in October. This testimony is, hence, too indefinite to afford any assistance in explaining the question.

Mrs. Harreld states, that she "heard Mrs. Fulton tell Colonel Fulton that she was able to walk, and that she wished to go home, as we (the witness and Dr. Harreld) expected a lady teacher in the family, &c., and that was the only room on the lower floor, and she thought we would need the room. Colonel Fulton's reply was, that court was in town, and it would be very unpleasant to her, and he thought she ought to remain longer;" that he then said he would see Dr. Harreld about the room, and went out on the gallery, where the Doctor was, and came back and told Mrs. Fulton, that the Doctor said he could have the room a month longer, or as much longer as he wished. When this scene occurred, Mrs. Fulton had partially recovered; she was lying in bed, but was not so unwell as to be closely confined to it. After her removal to Dr. Harreld's, up to this time, Mrs. Fulton had not been at Canton; and, according to the best recollection of the witness, these facts transpired in the month of October, 1854.

It is clear, if Mrs. Harreld is correct as to the true date of these transactions, that there is not the slightest ground for believing that any serious estrangement had arisen between these parties before some time in October, much less that they had then separated. Indeed, if this witness is perfectly accurate as to facts as well as dates, there would hardly be a pretence for saying that the separation, admitted and proved to have taken place, occurred before November. This would be fatal to the appellant.

But there is no doubt that Mrs. Harreld was, at the least, mistaken in the date she assigned to the transaction. It is proved by Dr. Harreld, that, early in October, on more than one occasion, the appellee had been in Canton; that before the interview between the appellant and appellee, which, he says, took place about the 10th of October, the latter went from his house to Canton, and, without consulting the appellant, had purchased a buggy. It was proved, that before that time she had visited C. C. Shakelford, at Canton, and on that occasion had requested him to see the appellant, and learn from him what disposition he designed making of the property, and what arrangements he intended to make for her future support and maintenance; declaring, during that interview, that it was impossible for the appellant and herself to live together. It is not pretended that, on any of these occasions, she went to the appellant's residence, although it was proved that he was at the time at home.

These facts are significant; and in view of the relations existing between the appellant and the appellee, of themselves, go far to prove that, very early in October, these parties were living in a state of separation. They are manifestly irreconcilable with the facts of the interview between the appellant and appellee, as detailed by Mrs. Harreld, upon the supposition that the interview took place at the time she said it did. And as it is only on the assumption that the facts transpired at the date assigned to them, that they are at all material, and believing that in this respect the witness was mistaken, we are not authorized to give any weight to this part of her testimony. Looking, therefore, at the facts proved by the testimony of the other witnesses, although it does not fix the precise date of the separation, it shows clearly that these parties

had separated, and were living apart some time previous to the 10th of October, 1854.

The statute provides, amongst other causes, that a divorce from the bond of matrimony may be decreed " for wilful continuance and obstinate desertion for the space of three years." And although it does not, in terms, decree that the desertion and consequent separation shall not be by the mutual consent of the parties to a proceeding for a divorce, such is doubtless the true construction. For otherwise, parties to the matrimonial contract, who, from any cause, should be desirous of putting an end to it, would have it in their power to attain their object, by a voluntary separation, continued for the prescribed period of time; and thus to defeat the manifest object of the law. In a proceeding for a divorce, on the ground of desertion, the statute, therefore, seems to have prescribed three things as essential to entitle the party complaining to relief. 1. A wilful desertion of the complainant by the defendant. 2. That such desertion by the defendant be continued for three years continuously; and 3, that the desertion be without the consent of the complainant.

In the case before us, it is distinctly proved that the parties were living in a state of separation, for the period of three years before the institution of this proceeding. But as it is obvious that the unaided fact of separation is not sufficient evidence of the desertion, avoiding the true intent of the statute, we will proceed to inquire whether that separation was without the consent of the appellant.

It appears from the testimony of Dr. Harreld, that while Mrs. Fulton was staying at his house, and after she had partially recovered from her illness, appellant stated to him that the appellee and himself could not live happily together, and that they would be compelled to separate. And the reason which appellant assigned was, the attachment of the appellee for Livingston Montgomery, whom he believed was the person who had inflicted the injury upon him at Cooper's Well. That he had determined Montgomery should never visit his house, and that the appellee insisted that he should be permitted to do so. And that Harreld was requested by the appellant to be present at an interview between himself and Mrs. Fulton; that he was accordingly present, when at said inter-

view the appellant " explained to the appellee that they must part, that they could not live together under the circumstances they were in." But "before the appellant got through making his statement, in as delicate a manner as he could make it, the appellee turned into crying," and the conversation was put an end to.

No date is assigned to these transactions, but it is manifest that they occurred before a separation had taken place. And, down to the time when it is certain that the parties had separated, these acts and declarations of the appellant, are the only facts which give the slightest color to the assertion that he ever desired a separation, much less that the abandonment of her home, by the appellee, was with the appellant's consent. The whole of the testimony of this witness, in reference to the question before us, is very vague and indefinite, particularly the account given of what passed at the interview which was broken off before the appellant had finished the explanation, which, it seems, it was his purpose to make. Giving, however, full effect to the testimony of this witness, it amounts to but feeble evidence, that the separation which afterwards took place, was with the consent of the appellant.

But the evidence of Dr. Harreld is materially weakened by the testimony of Briscoe, who testified that in an interview between the appellant and appellee, the latter stated that " she had been under the necessity of calling in some of her neighbors, to set the community right as to the difficulty between herself and the appellant; that rumor said she had left the appellant, which was not so; that she had gone to Dr. Harreld's under his (Harreld's) advice and invitation, so that he could have better opportunities to treat her case." To which appellant replied that " she had left the Well without informing him where she was going; that he supposed she was going home until they got to Culley's, at which place Dr. Harreld informed him that she was going to his house; that her language towards him at the Well had always been harsh and abusive, and continued to be so, after she came to Dr. Harreld's, until after his return from the first trial of Montgomery, at Raymond; that after his return her manner was as kind and affectionate as he could wish, and this change was owing to the evidence he had given on the trial at Raymond." This witness further testified, that " the appellant went on to state, that after he came back from Raymond

the second time, he told the appellee that though he did not want to form an opinion for her, as for himself, he was satisfied that Livingston Montgomery had shot him; that appellee replied she did not and could not believe it; and that he told appellee she could not expect him to permit Montgomery to visit his house, believing as he did, that said Montgomery had shot him." And further, that at the same interview, the appellant stated to the appellee that he had had an interview with her at Harreld's house, and in his presence, and that his object in desiring the interview, was to inform her, in Dr. Harreld's presence, before taking her home, that he believed that Livingston Montgomery was the person who had attempted his life at the Well.

All of this took place in the presence of Dr. Harreld; and it is evident that his attention was directed to what was said by the appellant on that occasion; as he objected to the statement of the appellant, that he was ignorant of the intention of the appellee to go to Dr. Harreld's house, until he was told so by him on the road, insisting that he had informed the appellant that Mrs. Fulton was going to his house, either at the Well or at Jackson. He made this objection, and no other, to the statements made by the appellant. As far, therefore, as anything else in which he was concerned, and of which he must have been cognizant, was alleged by the appellant to have taken place, his silence was an implied admission of its truth. His silence, therefore, goes strongly to show that he had very imperfectly remembered, and consequently had incorrectly stated, the facts of the interview between the appellant and the appellee, which he witnessed.

There can be no doubt that the statements made by the appellant, on the occasion of the interview in regard to which Briscoe testified, was evidence in the cause. There was not the least ground for suspecting that the parties to this proceeding were acting in collusion. The statements of the appellant were made in direct response to what had been addressed to him by the appellee. They were explanatory of the relations subsisting between him and the appellee, and of the motives upon which he acted, and hence are to be regarded in the nature of verbal acts, constituting a part of the *res gestæ.* 1 Greenl. Ev. 108, § 123, and cases cited.

Indisposed as we are to aid in increasing the facilities of divorce,

Fulton *v.* Fulton.

we are nevertheless compelled to hold that the evidence is insufficient to raise the presumption that the parties had separated by mutual consent, or even that the appellant desired a separation.

The case presented by the proofs is simply this. In consequence of the unhappy affair at Cooper's Well, the appellant had determined to cut off all intercourse between his family and Montgomery, by excluding that person from his house. The appellee, who was the mother of Montgomery, believing that the charge made against him by her husband was unfounded, at all events, being warmly attached to her son, was unwilling to deprive herself of his society, and insisted that he should be received and welcomed at the matrimonial mansion, as he had theretofore always been. And, for this cause, having gone to the house of Dr. Harreld, never afterwards returned to her home, and resumed the duties of a wife; and having withdrawn from all connection with the appellant, remained absent for the space of three years.

The legal right of the appellant, as husband, to prescribe who shall be received as guests or visitors at the matrimonial mansion, is not to be controverted. In this instance it cannot be said that this authority was either wantonly or harshly exercised, or for insufficient reasons. Under these circumstances, however much we may be inclined to palliate the conduct of the appellee, her abandonment of home and desertion of the appellant, admit of no legal justification.

But it is insisted, that the appellant was not entitled to the relief prayed for in his bill, for the reason that the appellee offered to return home and resume her duties as a wife.

Where parties have separated, for any cause, if one of them comes back and offers to renew the matrimonial relations, an end, in a legal point of view, would be put to the separation; as, in all cases, the legal desertion ends with the intent to desert. Bishop on Mar. & Div. § 513. But the offer to return, to have the effect of putting an end to the desertion, "must be made in good faith, free from improper qualifications or conditions, and really intended to be carried out in its spirit, if accepted." Ib.

If the offer to return, on the part of the appellee, was made in good faith, and the appellant, as it is alleged, refused to receive her, his refusal would amount to a desertion on his part, from the

time of such refusal, and therefore effectually bar his right to relief. Bish. on Mar. & Div. 513. Applying the principles above laid down, we are of opinion, that the defence relied on is not sustained by the evidence.

It appears, that about the 10th of October, 1854, the appellee, attended by several persons, invited for the occasion, went to the residence of the appellant, and said to him, that she had been under the necessity of calling in some of her neighbors, to set the community right, as to the difficulty between herself and the appellant; that rumor said she had left him, which was not so. That she had gone to Dr. Harreld's, under his advice, and at his invitation, in order that he might have a better opportunity of treating her disease. Upon which a colloquy ensued, in which much was said by the respective parties, not here material to be noticed, when Dr. Harreld said, "We are not effecting the purpose for which we sought this interview;" and then, addressing the appellee, asked, if she was willing to go home with the appellant. To which she replied, "she was; and would make him as good a wife as she had ever been." Dr. Harreld then asked the appellant, if he was "willing to receive her;" who replied, that if the appellee "would state in writing what she wished, he would answer it in writing." To this the appellee neither assented nor dissented. The answer to Harreld's question, "if appellee was willing to go home with the appellant," was made in the words above stated, without qualification or condition. But, from what passed between the parties, it appears that the appellee required that Montgomery should be permitted to visit their house. This condition was not expressed in terms, but it was the construction placed upon what she said, or the conclusion drawn, from all that was said and done on the occasion. The appellant threw no impediment in the way of healing the breach between himself and the appellee, to whom he was courteous and respectful. The appellee made no further offer to remain, and, neither by word or deed, manifested any desire to do so; and, at the termination of the interview, quitted the house.

Under these circumstances, it is impossible to consider the offer to live with the appellant as made in good faith, and free from conditions, upon which the appellee, as a wife, had no right to insist. The conduct of the appellant had not afforded the slightest ground,

which, in any legal point of view, justified the previous desertion. There is not the slightest evidence, that she was kept from home by any act, nor even by any declaration of his, of which she complained, with the exception that he would not agree to receive Montgomery as a visitor at his house. It was, most unquestionably, the duty of the appellee to go home, as soon as her health would permit; and if she returned, with the proper dispositions, she could have no just reason to apprehend that her return would not be welcomed. Under these circumstances, we very naturally inquire, why she should have deemed it necessary to call in her neighbors to witness her offer to return ? And no answer can be given which comports with the supposition that she acted *bona fide*, and from a sincere desire of reconciliation. On the contrary, it may easily be perceived, that she acted from very different motives. But if it were conceded that the appellee acted *bona fide*, and that she was really desirous of returning, to make good her defence, it was essential that the offer to live with the appellant should be proved to have been made, without any improper condition or qualification. This was not done. On the contrary, from the whole evidence, it is clear, that the privilege of receiving and welcoming Montgomery at the matrimonial mansion, was the condition upon which the appellee denied, or would consent, to return: a condition, on which she had no legal right to insist, and which, in all probability, she knew would not be conceded. And her conduct after the interview, furnished very conclusive proof, that the offer to return was either not made in good faith, or that, if she really desired a reunion with appellant, it was only upon that condition. Indeed, without giving any importance to the fact, of the previous separation, it is clear, under the circumstances established by the evidence, that the withdrawal of the appellee from the appellant's house, after the interview of the 10th of October, amounted to an act of desertion; and it is not pretended that, since that time, there has been any attempt at a reconciliation on the part of the appellee.

Finally, upon a full view and careful examination of the case, we are satisfied that the decree of the Chancery Court was erroneous; and therefore order it to be reversed, and the decree entered in this court which should have been rendered in the court below.