LAURA E. POWERS, APPELLEE, v. THOMAS POWERS, APPELLANT.

1. **Petition:** SUFFICIENCY. A petition, when assailed after a decree, will be held sufficient if the facts stated constitute a cause of action, even though informally and indefinitely stated. Such defects must be corrected by motion before answer or demurrer, or they will be deemed to be waived.

2. **Appeal:** FINDING SUSTAINED. In a case brought to the supreme court on appeal, where no question of law is involved, and the testimony is conflicting and pretty evenly balanced, the finding of the court will not be disturbed. *Callahan v. Callahan*, 7 Neb., 38.

   3. **Evidence** examined and *Held*, to support the finding of the district court.

APPEAL from the district court of Saline county.

*Harwood, Ames & Kelly*, and *Dilworth, Smith, & Dilworth*, for appellant.

*Dawes, Foss & Stephens*, for appellee.

REESE, J.

This is an appeal from Saline county. The action was brought to obtain a divorce, alimony, and the custody of a minor child. A decree for divorce, the custody of the child, $2,500 alimony, and $150 per year for the support of the minor child, was rendered. Defendant appeals from the decree granting the divorce and custody of the child to plaintiff, and plaintiff complains that the allowance of alimony is too small.

Two grounds for divorce are alleged in the petition. Habitual drunkenness and extreme cruelty. The finding of the district court was in favor of plaintiff upon the charge of extreme cruelty, but not as to habitual drunkenness.

34

Objection is made to the petition as not being sufficiently explicit in the allegations of extreme cruelty. These allegations are as follows:

" 4th. That the defendant, wholly regardless of his duties as a husband, has for the last five years treated the plaintiff with extreme cruelty without any provocation; that for more than five years preceding the 22d of March, 1884, he was guilty of extreme cruelty to her; that on many occasions he frequently struck her—he would use abusive, vulgar, and opprobrious epithets of and to her; that he accused her of being unchaste and untrue to him, threatened her life and put her in fear of doing her bodily harm; that when lady friends were visiting her he was sullen, cross, and insolent; that his conduct in this respect became so notorious and unbearable that her friends ceased to visit her; that on the 22d day of March, 1884, he was guilty of extreme cruelty to her. In this, he cursed and swore at her; called her vulgar names; in this, 'you damned old fool, you damned she devil, you damned bitch, you are too damned nice to live,' and other like language; that he was so vulgar, vicious, and insulting that she became frightened, and was afraid he would do her bodily harm; that anxiety of mind and mental anguish caused by the cruel treatment induced a nervous attack which prostrated her, and that she has ever since been under the care of a physician; that many times in the last five years, on occasions of his unkindness and ill-treatment, she had been driven from home and been compelled to seek protection with friends, but she has been induced to return and live with him by his repeated and solemn promise that he would treat her kindly in the future; that in consequence of his violating his promises and continuing to treat her with unkindness and cruelty and ill-treatment, her health has been greatly impaired; that on the 22d of March, 1884, he ill-treated her as aforesaid, that she was obliged to leave home and seek a home with her parents for herself and child;

that at that time she was and has been suffering with sickness caused by his ill-treatment, which caused her to be very sick; that she has been and is now under the care of a physician; that he is a man of coarse and vulgar habits, of high temper and revengeful disposition; that he has frequently, in the last five years, and more especially in the last two years, cursed and swore at her; that at such times he would vent his spite upon the little boy by kicking, striking, and severely whipping him; he would teach the little boy to swear at her and sit by and laugh at her while the boy would do it, and if she would try to stop the boy, he would curse and swear at her and abuse her in other ways so she was in constant fear of her life, and would threaten to whip the boy harder if she said anything. That on the 22d of March, 1884, she took said boy to her father's, a suitable place, where he can be taught proper manners, and have a good moral education; that he would come and intrude upon her at her father's house and demand that she return and live with him and bring the boy with her, and threatened her life if she did not, and that he would commit some terrible crime, shoot her parents, or steal the child and remove him out of the jurisdiction of the court. That on the 3d of November, 1884, he did come and steal and forcibly carry the boy off, and sent the following telegram:

"'FRIEND, NEB., Nov. 3d, 1884.

"'*Mrs. T. Powers, Crete, Nebraska:*

"'You might as well give up. I have my boy,' etc."

While the petition was probably assailable by a motion for a more specific statement, yet we think it sufficient when attacked after decree. It is alleged "that on many occasions he * * struck her; he would use obscene, vulgar and opprobrious epithets of and to her; that he accused her of being unchaste and untrue to him, threatened her life and put her in fear of doing her bodily harm," etc.

A petition may state a cause of action and yet be very informal. In Maxwell's "Pleading and Practice," 1885 Ed., page 113, it is said: "Mere defects of form, indefiniteness in the allegations of the petition, are not grounds of demurrer. These defects and others, if they exist, must be corrected by motion," etc.

The principal contention of defendant is that the decree is not supported by sufficient evidence : that, considering all the proofs, the finding should have been in his favor.

We have carefully read all the evidence in the case, and while we must concede that if this hearing was in an original and not appellate capacity, we might incline strongly to a different conclusion from that reached by the trial court, yet we cannot hold that that decision was wrong. And it is quite possible that, had we had the opportunity of the judge who tried the case, of an observation of the deportment of the witnesses and of those other aids which are supposed to shed light upon a cause on trial directly before the court, we might have arrived at the same conclusion reached by him.

In the capacity in which this court now sits we must apply the fundamental and well-established rules applicable to such a capacity—that the decision is presumed to be correct and that wherein the testimony is conflicting thereon will be sustained unless clearly wrong. *Callahan v. Callahan,* 7 Neb., 41.

The testimony is quite voluminous and is very contradictory. In fact we do not remember of having perused a record in which appears a more sharp and unreasonable conflict of the statements of the witnesses. This occurs not only in the testimony of the interested parties, but in that of those who are supposed to be wholly disinterested and destitute of bias. It is a lamentable fact that the disposition to *help* the side calling the witnesses is (unconsciously, perhaps) shown by many. It is charged, and no doubt believed by some, that had it not been for the med-

dlesome interference of persons other than the parties to this unfortunate controversy, there would have been no trouble nor domestic discord, and the family which is now separated would have remained together. However much such interference is to be condemned by all right thinking people, yet this is a matter not submitted for decision by this nor the trial court. As the case is found and submitted, so it must be measured and weighed, upon its own merits and facts, as they exist, without reference to the cause.

As we have said, the testimony of the witnesses is irreconcilable, and for the purpose of this review, it only becomes. necessary to examine the evidence produced by plaintiff and ascertain whether that, if believed by the trial court, is sufficient to sustain the decree. We quote from the testimony of plaintiff:

" We lived there " at Sutton " five years. He was drunk nearly all the time. He would come home very often and vomit on the floor. * * * He kept liquor in the house in a closet off of the sitting room. For the last three years he nearly all the time had a bottle of whisky at night under his pillow or under the bed. Sometimes I would empty it out and he would not know the difference, thinking he had drank it up. I told him it was mortifying to me to meet him always coming out of a saloon. He told me if I would let him have his liquor at home like other people, he would not go off to the saloon. I told him then he could bring it if he would only take it three times a day and not to excess. He would bring it home by the quart and the little boy would play keeping saloon for his papa, and I told him we could not bring him up that way. I told him that he could not bring it to the house any more, and he cursed and swore, and sometimes he would bring it and hide it. There was a half bushel of bottles that I had gathered up and put in the cellar when I came away that I had not destroyed. They were flat pint bottles and half-pint bottles. Mr. Powers had used the whiskey.

Just before I left he was drunk every hour of the day. For the last three months he seemed to be almost constantly drunk, with the exception of one time, about the first of January, when he gave me his last promise. He came home about nine o'clock, while I was undressing the baby to put him to bed, and he came in in a few minutes and commenced cursing me. I asked him why he did that; that I had said nothing to him. He cursed and said it was a pretty time for a person to find fault about his coming home late. I told him it was all right. He cursed so that the little boy cried. I told him it was too bad and that he ought not to curse before the child; if he wanted to curse me please to wait until I put Sammy to bed. He did. I went out into the room and he cursed me and called me names. 'You damned old hussy, you; you think I am asleep, you have been threatening to leave, now you have got to go. He said if I would go he would give me $10,000, and said all I had to do was to get ready and go. I told him I would if he would give me the things to go with; I had no trunk. He said all I had to do was to go down town and buy one. He said I was nothing but a damned whore any way, that the sooner I went home the better it would please him. He had called me that before. * * * Our child is six years old. He was sick during the winter, in the month of January. My husband was drinking during the child's sickness. I wanted the doctor to come. He came, but my husband kept me out in the other room and talked to him. I wanted him to come in but he still had this spell on him. After that my sister-in law went away and baby was sick and I wanted him to get the doctor for him and he wouldn't.'

* * Mr. Powers' conduct was very bad. One night I thought Sammy would die. Mr. Powers was drunk all the time. He came to the door and jerked it open and I told him I thought Sammy was dying, I wished he would please get him some water. He said he wished the ——

—— —— young one would die or sink into hell. He finally brought the water and set it on the piano. * *
* * When he was drunk he would tantalize the boy and teach him to swear. One night he came in drunk while I was undressing Sammy and he did not want his clothes off. I was playing with him. Mr. Powers came in and said, 'If you can't make that young one mind I will.' He grabbed hold of him and struck him with his cane, and we jumped and screamed and took Sammy away from him. He said he did not think he was hitting him so hard as that. * * * * He would swear at me and tell me I was a —— —— fool. He always told me I was a —— —— lazy hussy and he has called me a bitch ever so many times. * * * * My health was poor when I went home. It was from his drinking. I used to be afraid of him. He would walk the floor and flourish his cane and act as though he would strike me. I used to be afraid he would kill me. I used to sit up all night, thinking he would kill me before morning."

In so far as the profanity of defendant is concerned, I think it unnecessary to refer to the testimony of any other witness, as the proof is abundant on this point. This of itself furnishes no ground for a divorce, yet when taken in connection with other facts it may very properly be considered as giving color to the conduct of plaintiff when accompanied with the indulgence of this detestable and pernicious habit. The constant use by a husband of profane language to a wife, will not ordinarily furnish very strong evidence of that high degree of affection and sweetness of disposition which is supposed to add to the pleasures of home.

The testimony of plaintiff as to the treatment received from her husband is fully corroborated by the witness Emma Welch, and in some degree by the testimony of Mrs. Birney and Charles Birney. The testimony of Emma Welch is sharply criticised by counsel for defendant, and

apparently not without cause, for she seems to have been prompted by a desire to render what aid she could to plaintiff's cause; yet it is possible she might have been, in the main, correct.

The testimony given on the part of plaintiff was all pointedly and flatly contradicted and denied by defendant and his witnesses, and had the trial court adopted the line of testimony presented by him as true, the finding could and would have been sustained on appeal. By the testimony produced by defendant, if uncontradicted, it is made to appear that, aside from his habit of profanity, he has been a kind and affectionate husband. But upon this the trial court has acted, and we cannot say that the decision is manifestly or clearly wrong.

It is shown, I think, to the satisfaction of any candid mind, that defendant was in the habit of using intoxicating liquors to a great degree of excess. The trial court found the charge of habitual drunkenness not proven. With that part of the case we shall have nothing to do. But we may remark that there is abundance of proof that defendant did drink at times to excess, and that when under the influence of liquor he was boisterous, quarrelsome, oppressive, and, at least, disgustingly unpleasant. This alone might not fill the legal requirement as to habitual drunkenness. But if these practices were indulged in at home in the presence of the family, taken in connection with the habit of profanity, they would very clearly give character to the acts testified to by plaintiff and her witnesses. Occasional drunkenness cannot be a ground for divorce, but such drunkenness of the character detailed by the witnesses, if believed, would not only add a poignant sting to cruelty in the way of danger, but would add also to the anguish of the recipient of the treatment by a fear of aggravated violence. Suppose the testimony of plaintiff is true, as was no doubt found by the court,—that he would walk the floor and flourish his cane and act as though he

would strike her, and that she would sit up all night thinking he would kill her before morning, and as stated by an apparently disinterested witness, his conduct seemed to be affected by the use of liquor, and he under the influence of the same, from ten to fifteen drinks a day," what would naturally be the effect upon the wife? Clearly, I should say, this would be "extreme cruelty, whether practiced by personal violence or by other means," as prescribed by section 7, chapter 25 of the Compiled Statutes as ground for a divorce.

The question of the custody of the child is one which must be decided by the application of substantially the same rules as are applied to the foregoing. If the testimony of plaintiff and her witnesses is true, the decree for the custody of the child was proper.

Plaintiff contends that the amount of alimony allowed her was insufficient. Taking the whole testimony together as to the financial condition of defendant, we cannot say it was too low.

The time for the payment of the alimony having, in part, elapsed, the decree will be so modified as to require the payment of the $2,500 as follows: $800 within thirty days, $800 within four months, and the remainder within nine months from date. The whole to draw interest at the rate of seven per cent from the date of the rendition of the decree in the district court.

In all other respects the decree of the district court is affirmed.

DECREE ACCORDINGLY.

THE other judges concur.