Walton v. Walton.

BARBARA S. WALTON, APPELLEE, v. THOMAS WALTON, APPELLANT.

FILED DECEMBER 8, 1898. No. 8440.

1. **Divorce:** FINDINGS IN FAVOR OF WIFE: EVIDENCE. The evidence examined, and *held* to sustain the findings, both general and special, of the district court.

Walton v. Walton.

2. ———: CRUELTY OF HUSBAND: MISCONDUCT OF WIFE. It is a general rule that a husband's cruelty caused by the conjugal misconduct of his wife does not invest her with a cause of action for divorce.

3. ———: ———: ———. But if the husband's cruelty was disproportionate to his wife's offense, her conduct affords him no justification, and the cruelty entitles the wife to relief.

4. ———: ———: ———: QUESTION OF FACT. Whether a wife's disobedience of her husband, her misconduct, or impropriety, caused or provoked the husband's cruelty toward her is a question of fact.

5. ———: ———: ———. Whether the cruelty inflicted by a husband upon his wife because of her disobedience, impropriety, or misconduct was so far disproportionate to her offense as to be unjustifiable is a mixed question of law and fact, to be determined in any case from the particular facts and circumstances in evidence therein.

6. ———: ———: ———. No conduct on the part of a wife that does not threaten great and immediate bodily injury will justify her husband in beating or choking her.

7. ———: ———: ———. No conduct on the part of a wife, short of notorious and shameless unchastity,—if that does,—justifies her husband in calling her a "whore."

8. ———: ———. A husband who falsely, and without reasonable cause therefor, charges his wife with unchastity, accuses her on the public streets with being criminally intimate with other men, calls her vile, opprobrious, and degrading names, beats and chokes her, is guilty of extreme cruelty within the meaning of section 7, chapter 25, Compiled Statutes. (*Berdolt v. Berdolt*, 56 Neb. 792.)

9. ———: ———. Nor is the husband's offense deprived of its legal character of "extreme cruelty" because his conduct was the result of his insanely jealous temperament, actual insanity not appearing.

10. ———: ALIMONY: DETERMINATION OF AMOUNT. There is no fixed rule in this state for determining what proportion of a husband's estate should be decreed to his wife as permanent alimony. The amount should be just and equitable, due regard being had for the rights of each party, the ability of the husband, the estate of the wife, and the character and situation of the parties.

11. ———: ———: ———. In the case at bar the parties had been married six months. The wife was thirty-eight years of age and healthy. She had no one depending upon her for support. The husband was worth $24,000, no part of which the wife had con-

tributed. The marriage was dissolved because of extreme cruelty practiced by the husband toward the wife. *Held*, (1) That the decree of the district court awarding her $5,000 permanent alimony and counsel fees of $700 should be affirmed; (2) assuming extreme cruelty is misconduct within the meaning of section 23, chapter 25, Compiled Statutes, entitling a wife to permanent alimony equal in value to a dower interest in her husband's real estate, that it did not affirmatively appear from the evidence but that the permanent alimony awarded was equal to the value of such dower; (3) that the wife, by praying in her petition for a reasonable sum as permanent alimony, elected to take such reasonable sum of money in lieu of dower in her husband's lands.

Appeal from the district court of Lancaster county. Heard below before Cornish, J. *Affirmed.*

See opinion for references to cases cited.

*Lamb & Adams,* for appellant.

*Field & Brown, contra.*

Ragan, C.

Charles [W. C.] Griffith, from 1888 until the trial of this case in the district court, in 1896, was a married man, fifty-three years old, and a citizen and resident of the city of Lincoln, owning a residence therein in which he resided with his family. Griffith seems to have been a farmer and stock-raiser by occupation; at least during this time he owned two large farms of about 800 acres each,—one of them situate about thirteen miles from the city of Lincoln, near the village of Raymond; the other located about four and one-half miles north of the city of Lincoln, and called "Arbor," because a post office by that name was established at the house on this farm. On this latter farm were extensive buildings used in connection with the farming operations and the growing and handling of stock conducted thereon. In the management and conduct of these farms Griffith seems to have adopted in the main a system of carrying them on by means of hired help instead of leasing them. He was

frequently at these farms and frequently spent a night thereat. Griffith kept a number of men and women from time to time in his employ at the Arbor farm,—the men engaged in the cultivation of the farm and the care of the stock, and the women doing the housekeeping, washing, and cooking for the men employed. Griffith was frequently at this farm, spending as much perhaps as three days in each week there; had a room fitted up at this farm, which he occupied when he remained there over night; and when at the farm boarded with the person keeping the house. During part of this time—from 1888 until 1895—there lived in the city of Lincoln, Thomas Walton, a widower with three grown children. He was a man of considerable wealth and about fifty-seven years of age. He and Griffith were, and had been for years, well acquainted, and were good friends. During this time it does not appear that Walton was engaged in any particular line of business. He owned various pieces of real estate, collected the rents therefrom, and lived with his grown daughter, in a residence owned by him in the city of Lincoln. In 1860, near the city of Harrisburg, Pennsylvania, was born a girl to whom was given the name of Barbara Herr. Subsequently there were born to Barbara's father and mother two sons, one of whom was named Chris and the other George, and another daughter to whom was given the name of Minnie. The parents of these children were farmers, and the children were raised upon a farm in Pennsylvania, and, it appears, raised in the manner that the children of farmers in ordinary circumstances are raised. They worked upon the farm, went to the common schools, and lived with their parents until they were all grown. These children were second cousins of Griffith, who also at one time lived in Pennsylvania, and emigrated therefrom to Nebraska about 1870. He seems to have lived while in Pennsylvania in the same neighborhood as the Herrs, was well acquainted with the children and the parents, and had known the latter

since or before their marriage. Some time prior to 1886 Chris Herr came to the state of Nebraska, and went upon the Raymond farm of Griffith, and either as an employé of Griffith, or as a tenant, was in 1888 operating that farm. In July of that year Chris' sister Barbara, being then about twenty-eight years of age, came from Pennsylvania and kept house for her brother Chris, who was then a single man at this Raymond farm. During this time Barbara's brother George, also a single man, was in Griffith's employ on the Arbor farm. Barbara remained at the Raymond farm keeping house for her brother Chris until January, 1891, at which time Chris married; and in March, 1891, Barbara went to Arbor, and began keeping house for her brother George, and so continued until March 13, 1895. In June, 1891, Minnie Herr also came from Pennsylvania and made her home from that time with her sister Barbara and her brother George, at Arbor. These two girls—Minnie and Barbara—from the time they went to Arbor, did the cooking, the washing, and the housekeeping generally done by women upon farms; and during all this time there were various men in Griffith's employ at this farm who boarded at the house; and if a man in Griffith's employ at the farm was a married man, he kept his wife and family with him, and sometimes the married man and his wife lived in the house with the Herr girls and George. These girls—Minnie and Barbara—were hired and paid by their brother George for the work done for him in this housekeeping. During this time Griffith was frequently at this Arbor farm, as already stated, spending perhaps three days and nights of each week there. He had some of his laundry work done there, and for this he paid the girls. Included in the duties of housekeeping was that of taking care of all the rooms of the house occupied by the persons who lived and slept there, including the room occupied by Griffith when he was there.

In December, 1890, Thomas Walton became ac-

quainted with Barbara Herr, subsequently frequently visited and courted her, and finally, on March 13, 1895, married her.  After the marriage Walton took his wife to his home in Lincoln, and the two resided there with Walton's daughter by his first wife, until September 21, 1895, when Mrs. Walton left him, and in October afterward sued him in the district court of Lancaster county for a divorce, alleging as grounds therefor that on August 12, 1895 her husband, without any provocation, used vile and opprobrious epithets toward her, calling her "a damned mean woman, a bitch, bad woman, a God damned liar, a God damned fool," and saying to her: "I do not care where in the hell you go.  You have made hell ever since you were here, and I do not care where in the hell you go to.  You are nothing but a whore, always have been, and always will be; and I am not going to live with a son-of-a-bitch like you.  Take your duds and go;" that since August 25, 1895, her husband had refused to provide her with any money or means to provide for herself; that on July 20 her husband, without cause or provocation, accused her with having been guilty of adultery with Griffith and other persons since her marriage, accused her of being a vile woman, and called her a whore and other vile names; that on September 14, 1895, her husband caused to be published in a daily newspaper in the city of Lincoln a notice forbidding all persons from giving credit to her; that the publication of such notice was without any cause or provocation; that she had never at any time purchased any goods or contracted any debt whatever upon the credit of her husband; that her husband, unreasonably and without any cause, forbade her sister Minnie and her brother George from visiting her at her home, and on September 4 of said year notified her brother and sister and Charles Griffith in writing not to come upon his premises; that since September 8, 1895, her husband had refused to eat at the same table with her, and refused to eat food prepared by her, falsely alleging as a reason

therefor that she intended to poison him; that on September 14, 1895, her husband, without any cause or provocation, willfully and cruelly struck and beat her, and again on September 21, without cause or provocation therefor, seized and choked her, and at both of these times called her vile and opprobrious names; that this conduct on the part of the husband toward her constituted extreme cruelty, and put her continually in fear of bodily injury to such an extent that on September 21 she was compelled to and did abandon the husband's home. There were further allegations by the wife that during all of her married life she had been faithful and chaste to her husband, and had faithfully performed all of her marital duties and given him no cause or provocation for his cruel treatment.

Walton, in his answer to this petition, admitted publishing the notice forbidding persons to give his wife credit, alleging as a reason therefor that she had threatened to pledge his credit, notwithstanding he had provided her with all the necessaries of life; admitted that he had forbidden the sister and brother of his wife and Griffith to visit her at their home, and alleged as a reason therefor that they were maliciously intermeddling in the affairs of himself and wife, and attempting to alienate her affections from him; admitted that after September 13 he had refused to eat at the same table with his wife, and alleged as a reason for this conduct that he feared his wife intended to poison him. He denied generally the other charges against him, and interposed as an affirmative defense that his wife had conducted herself improperly toward him; that she became cross, morose, and abusive; called him "an old fool;" said she was ashamed of him; said she was ashamed to be seen in his society; called him "old stinginess;" said that she married him for his money; said that she had been unfaithful to him, and criminally intimate with other men, and would be so again; that on May 27, 1895, and at divers dates after that time, she had committed adultery with

Griffith and with other men to him unknown; that she threatened to strike him with a butcher-knife, threatened to put him out of the house, and to lock him out, and did on one occasion push him off the porch of his house. The prayer of his answer was that his wife's petition for a divorce might be denied, and that he might be granted a decree of divorce.

The district court found generally in favor of the wife and against the husband, and specially found that the husband had been guilty of extreme cruelty toward the wife; that on August 12, 1895, he had applied to her vile and opprobrious epithets, and accused her of being guilty of adultery; that on July 20, 1895, he had accused her, and said to her that she had been guilty of adultery with Griffith, and at said time applied to her vile and opprobrious names; that on September 8, 1895, he had charged her with having poisoned and having intended to poison him; that on September 18, 1895, he had struck and beat her, and on September 21, 1895, he had seized her and choked her; that all these acts of cruelty were without cause or provocation, and that on September 21, 1895, the wife's health, by reason of the cruelty practiced upon her by her husband, was impaired, and that on said date, without any fault on her part, she was compelled to and did abandon his home. The court further specially found that the accusations and charges of adultery made by the husband against the wife were without provocation in truth or in fact, and were made by the husband for the purpose of willfully and cruelly treating the wife. The court further specially found that each and every of the charges of adultery made against the wife by the husband were acts of extreme cruelty and were each and every one of them false and willfully and intentionally made by the husband; that the wife had at all times conducted herself toward her husband as a chaste and dutiful wife. The court further found that the husband was possessed of property of the value of $24,000 and entered a decree giving the wife a divorce as prayed for in her

petition, awarding her permanent alimony of $5,000, and counsel fees of $700. From this decree the husband appeals.

1. The bill of exceptions in this case consists of more than sixteen hundred pages, and we shall not therefore attempt even a *résumé* of the evidence, but content ourselves with saying that it amply sustains each and every of the general and special findings made by the district court.

2. A contention of the appellant is that the evidence establishes that his misconduct and cruelty toward his wife were provoked by her misconduct and impropriety, and he invokes the principle that one is not entitled in equity to be relieved from the consequences of an act which his own wrongful conduct provoked. The alleged impropriety or misconduct of which the plaintiff alleges his wife was guilty consists in several things. He claims that soon after their marriage his wife became cross and morose, called him an old fool, said she was ashamed of him, said that she married him for his money, told him that she had been unfaithful to him, that she threatened him with a butcher-knife, and pushed him outdoors. The evidence fails to establish that the wife ever threatened her husband with a butcher-knife, or pushed him outdoors, or that she ever told him that she had been unfaithful to him. The evidence does show that some time after her marriage she became morose and irritable, but the record justifies the conclusion that the appellant's conduct was responsible for such condition of his wife. She did at one time call him an old fool, but under what circumstances? In one of his abusive tirades,—in which he seems to have frequently indulged,—he so far forgot himself as to call her a whore, and she responded, "You are an old fool." The record sustains the wife's judgment. She did say to him once that she was ashamed to go out with him; but it appears that the appellant was an uncouth man in his habits and dress, and, among other things, wore trousers entirely too large for him,

and his wife suggested this fact and persuaded him to allow her to alter them to the proper size, which she did; and at one time when they were going or about to go down to the city she spoke of his uncouth appearance, and in that connection made the remark that she was ashamed of him, or ashamed to be seen on the street with him; but this was not maliciously said, and should not have been seriously considered by the appellant. There are very few married women, we opine, who have not used similar language to their husbands; and, generally, when it has been used, it was, as in this case, because the wife desired to see the husband look tidy and neat. She did not say to him that she married him for his money, but in one of his outbreaks of temper he charged her with having married him for his money, and the substance of her response was that a girl like herself would have been foolish to have married a man of his age who had no money. Again we think her judgment was correct. The wife made social calls upon ladies living in her neighborhood, and attended churches and social gatherings. The appellant complained of these things; but the record does not disclose that the neighbors she called upon were not people entirely respectable, nor that she ever went to church or to social gatherings in company with any man, returned with any man, or that she went to the churches or social gatherings for the purpose of meeting any man. But the chief charge of misconduct against the wife is the visits she made to her sister at Arbor after she knew that her husband was unreasonably, or, to use the language of his counsel, "insanely jealous of Griffith;" and that these visits to her sister were made contrary to the husband's wishes or commands. It appears that after the wife knew that her husband objected to her visits to Arbor she refrained for some weeks from going, but she did make several visits to her sister after she knew that her husband objected to her so doing. None of these visits, however, were clandestinely made, and they were all made in the day-

time. Three persons accompanied her upon one of these vistis. Upon another her cousin, Mrs. Gotschall, accompanied her, and the third time there were six persons in the party. The last visit made by her, her brother and sister were present with her all the time she was at Arbor, and nothing in this record supports, or tends to support, the theory that the wife's visits to Arbor were for the purpose of seeing Griffith. Appellant believed, or affected to believe, that Griffith and his wife at this time were criminally intimate, and upon that ground he objected to her making these visits. His argument here is that his wife owed him implicit obedience and that her violation of his commands in respect to these visits was a violation of her marriage contract.

We do not understand that a wife at all times and under all circumstances owes implicit obedience to the husband. We do not understand that a wife's contract of marriage is an indenture of servitude; and, in view of the facts in this record, while the wife's visits to Arbor may not have been prudent, and may have tended in some degree to intensify the jealousy and the cruel conduct of the appellant, still we do not think that these visits caused or provoked the cruel treatment awarded her by her husband; nor do we think that by making these visits the wife violated her marriage contract. Not one of these visits was maliciously made; not one of them was made for the purpose of seeing Griffith. At Arbor lived the sister of this wife. The two had grown up together as playmates and schoolmates, and as members of the same family. They were a thousand miles from father and mother, and it was the promptings of natural affection that induced this wife to go to Arbor to see her sister, and at one of the visits complained of the sister was sick, and the wife visited her because thereof. But assuming that the wife in calling on her neighbors, attending church and social gatherings, and visiting her sister was guilty of disobedience, the punishment inflicted upon her therefor was out of all proportion to the offense. No

conduct on.the part of a wife that does not threaten great
and immediate bodily injury will justify her husband in
beating and choking her; and we can conceive of no con-
duct on the part of a wife, short of notorious and shame-
less infidelity,—if that does,—that justifies the husband
in calling her a whore, a bitch.  To understand—to ap-
preciate—this chapter of domestic life one has only to
become familiar with this record.  Soon after appellant's
marriage he become possessed—or they became possessed
of him—of several delusions.  One of these was that his
wife had married him for his money, and yet he swore
on this trial that no one knew anything about his finan-
cial affairs.  Appellee was neither an expensive nor an
extravagant wife.  She kept in her employ neither
seamstress nor servant.  She did her own housework,
including the cooking and laundry work.  She spent dur-
ing the six months of her married life $229 of her hus-
band's money.  Of this sum $203 went for carpets, fix-
tures, etc., to furnish the home.  Appellant seems to have
been a man of little culture or refinement, careless of his
personal appearance, his dress, and the comforts of a
home.  He had spent much of his life in the accumulation
of property, and it is probable that if he had affection
for anything it was this; and when he was asked to part
with some of his wealth for carpets and furniture he felt
he was wronged, imagined himself being robbed, and on
the road to the poorhouse.  His conduct on the first day
of his marriage demonstrates the relative value of money
and a wife in his mind.  He was married about noon at
Wahoo and went at once with his wife to Omaha, where
they had to remain several hours before taking the train
for Lincoln.  Instead of going to a hotel at Omaha, he
and his wife spent the time in the waiting room of the
railroad station; and when supper time came he gave
her fifteen cents and told her to buy herself a lunch.  We
are not surprised to find that a man who held his wealth
in such affection as this should entertain the next de-
lusion, namely, that his wife intended to poison him.  He

seems to have found proof sufficient to satisfy him of this in her emptying a vessel—in which he had vomited when sick—before the physician arrived, contrary to his instructions, although the wife acted from motives of cleanliness, not knowing of what crime she was suspected by her husband. A third delusion of the appellant was that his wife was an adulteress, chiefly with Griffith, but by no means limited to him. He knew when he was courting her, when he married her, that she had lived for four years at the Arbor farm as her brother's housekeeper and that Griffith was frequently there. He met Griffith there during the courtship. He saw and knew all there was to see or know, and was satisfied, pleased. In a few short weeks after his marriage, when his passions had cooled, when hope had ended in fruition, when this woman had become all his, then, realizing how fair she was, he stood astonished and surprised at his own good fortune. He remembered that he had not had her always; that he did not know every act of her life; reflected that she had met and seen and been acquainted with other and younger men; remembered that she had lived four years at Arbor, and that Griffith was frequently there; that he had been kind to her; took an interest in seeing her married and settled in a home; and then he reflected that here, at least, was opportunity! And from the depths of his imagination arose the spectre of adultery! From this time forth the wife of his bosom becomes a suspect. He construes her innocent desire to see him look neat into aversion for him. He sees in her evening calls on a neighboring lady a plan to meet a paramour. A trifle "light as air" becomes, in his diseased imagination, a crime. He sees in the smile and laugh that he should have cherished his wife's invitation to an unholy liaison. As early as July 26 a Mrs. Wagner, a Mrs. Bebout, and Frank Wagner, a young man of about twenty years of age and a son of Mrs. Wagner,—neighbors of the Waltons,—and Mrs. Walton went in a two-seated carriage into the country, called upon several

people, and were gone until late in the afternoon. It appears that Frank Wagner drove the team and occupied the front seat with Mrs. Walton, the two older ladies sitting in the back seat. When appellee returned to her home her husband seems to have been in one of his jealous moods, and he coldly, cruelly, and deliberately asked her, "Did Frank bang you to-day?" Nor did appellant content himself with making personal accusations to his wife of her infidelity, but in a public street of the city of Lincoln, in front of a hotel, in the presence of various men, publicly and cruelly stated that his wife was criminally intimate, not only with Griffith, but with other men, none of whom he has ever claimed to know, or be able to identify; and this from a husband concerning a wife whom he had promised to love, honor, and protect! And yet it is argued at this bar in this case that this wife was not justified in leaving her husband's home. Home? This was not a home. It was a place of torment. She was justified in fleeing as she would from a plague or a pestilence.

We call these conclusions of the appellant delusions, because the record will justify no other nomenclature. Neither of them was a rational deduction from any fact or circumstance, or all the facts and circumstances, disclosed by this record. The theory of the appellant that his wife was an adulteress was and is a delusion. Whether produced by jealousy, a diseased mind, or a degenerate imagination, still it was a delusion. There is not in this record any evidence, express or inferential, that this wife was at any time or place guilty of any improper conduct with any man. Her reputation from the time she was a schoolgirl in Pennsylvania until the date of this trial in the district court was laid bare before the judge who tried this case. The men and women who had known her when a child, when a young lady in Pennsylvania, the men and women who were acquainted with her after she reached Nebraska, the members of her church, the people who met her at social gatherings, the people who met her

at Arbor, one and all, unite in saying that this woman's reputation for chastity was above suspicion; and though appellant employed detectives to follow and watch this wife; though he condescended, in bare feet on moonlight summer evenings when she was at a neighbor's, to watch her; condescended to creep and crawl where a nobler man would have walked or not have gone,—yet not one improper act or word upon her part with any other man was proved, nor any fact or circumstance established from which an improper intimacy upon her part with another man could be rationally inferred; and at the risk of being deemed sentimental we affirm, after a careful study and an understanding of it, that this record is but a history of a woman wronged by a husband's cruel, unreasonable, and brutal conduct. Had she been a weaker woman, she might have gone insane or committed suicide; and had she been a woman more combative by nature, she might have become to her traducer an avenging Nemesis.

Into the trial of this case the appellant introduced another theory, which is skillfully interwoven into the brief filed here. It is this: that this wife, from the time she came to Nebraska, was Griffith's mistress; that he caused her to come to this state for that purpose; that after her sister Minnie began living at Arbor, Griffith desired to substitute her as his mistress instead of the appellee, and for the purpose of effecting this exchange Griffith, the appellee, and her sister—the brother perhaps aiding, abetting, and consenting thereto—entered into a conspiracy to bring about a marriage between the appellant and the appellee; and having accomplished this, they further conspired to break up the marriage and endow the appellee with appellant's property. We have called this a theory, not a delusion; and a theory we think it is, as malicious as dangerous. It was and is merely an insinuation, both cruel and cowardly. It assailed not only the reputation of appellee and Griffith, but it struck at the reputation of the sister, and the peace and happiness of Griffith's

Walton v. Walton.

wife and daughter. With the delusions heretofore mentioned and this latter theory the appellant constructed a web, beautiful from an artistic standpoint as that of the spider and quite as cruel, in which to entangle and destroy the reputation and happiness of all these persons; and had the appellee's case been in the hands of less able counsel, he might have succeeded. But the theory of a conspiracy either to bring about this marriage or to destroy it has no support in the evidence in this record. It was born of cunning and malice; flourished while fed by degenerate imaginings, but perished when exposed to the light of a court of equity.

In support of the contention that the wife's disobedience of her husband provoked and thereby justified the cruelty practiced by him toward her, counsel for appellant cite the following cases: *Fulton v. Fulton*, 36 Miss. 517; *Taylor v. Taylor*, 26 N. Y. Supp. 246, 74 Hun 639; *Evans v. Evans*, 82 Ia. 462, 48 N. W. Rep. 809; *Nullmeyer v. Nullmeyer*, 49 Ill. App. 573; *Blurock v. Blurock*, 30 Pac. Rep. [Wash.] 637; *Coles v. Coles*, 32 N. J. Eq. 547. In these cases, or most of them, it was held that the wife, by her improper conduct, had caused the husband's cruelty made the basis of her petition for a divorce, and that therefore she was not entitled to relief. A review of two of these cases must suffice, as they are representatives of all.

In *Evans v. Evans*, 48 N. W. Rep. [Ia.] 809, the wife sought a divorce from her husband because of his "inhuman treatment." It appeared that he had falsely accused her of unchastity. No physical violence was shown. It appears that the wife had permitted other men than her husband to scuffle with her, to kiss her, to put their arms around her, and to take other liberties with her of a like nature; that the husband knew this, and it aroused his jealousy and made him angry. The district court found that this conduct of the wife caused and provoked the indecent language and the false accusations of unchastity made by the husband against the wife, and denied her a divorce, and its judgment was affirmed.

Another case is *Reed v. Reed*, 4 Nev. 396. In that case the wife sought a divorce from her husband on the ground of extreme cruelty practiced toward her, which consisted in his beating and choking her; but it appeared that this conduct on the part of the husband was provoked and caused by a physical assault or attack made upon the husband by the wife with a spade, and the court below held that the wife's conduct had provoked the cruelty which she made the basis of her claim for divorce, and denied her relief, and this judgment was by the supreme court of the state affirmed.

But the facts in the two cases noticed, and in the other cases cited by the appellant, are very different from the facts of the case at bar. Here the record discloses no improper intimacy on the part of the wife with other men, her husband knowing which made him jealous and caused him to assail his wife with the lewd and virulent epithets and charges which he did. There is no pretense here that the husband beat and choked the wife because of a physical attack made on him by her. While it is true that when it appears that the husband's cruelty is the natural and probable consequence of the misconduct of the wife, she cannot make such cruelty the basis of a divorce, still this is only a general rule, and if it appears that the husband's misconduct was wholly unjustified by the wife's provocation, and his cruelty out of proportion to her offense, she may be granted a divorce because of his cruelty. (1 Bishop, Marriage & Divorce secs. 1641, 1644.)

The supreme court of Minnesota, in *Segelbaum v. Segelbaum*, 39 N. W. Rep. [Minn.] 492, states the rule thus: "Provocation which is disproportionate to the wrongs and injuries suffered is insufficient to sustain a plea of justification."

The supreme court of Texas, in *Jones v. Jones*, 60 Tex. 457, discussing the question under consideration, said: "Recrimination is a valid defense when the recriminatory fact is of a like character with the act of the defendant

for which the divorce is sought, or when the difference between the offense of the plaintiff and that of the defendant is merely slight in degree of guilt; but some allowance must be made for human frailty, and the plaintiff must not be required to be without fault in order to obtain a divorce for the defendant's great wrong." To the same effect are *Griffin v. Griffin*, 8 B. Mon. [Ky.] 120; *Mayhugh v. Mayhugh*, 7 B. Mon. [Ky.] 429; *Shores v. Shores*, 23 Ind. 546.

*Wheeler v. Wheeler*, 53 Ia. 511, is strikingly in point here. The court said: "The excuse offered by the defendant is that he disliked to have his wife associate with the Lanes. * * * [Lane is the man accused of adultery with his, Wheeler's, wife.] There is no evidence to show that the defendant had any grounds for his fancied or real opposition to the Lanes. But admitting that in such a matter he must judge for himself, this gave him no right to call his wife vile names and abuse her and accuse her of want of chastity. It is said that because the plaintiff persisted in associating with the Lanes when the defendant objected to her so doing, she by her own conduct brought about the difficulty of which she now complains. * * * We are unable to find from the evidence that the foregoing proposition of fact is true. * * A man who persistently calls his wife a 'whore' * * * is fast preparing himself to resort to harsher measures to degrade her. Conceding it to be true that plaintiff may have been indiscreet, there is no evidence tending to show that she was unchaste. She therefore must be regarded as a virtuous woman and imbued with the feelings of such."

Whether a wife's disobedience of her husband, or her misconduct, or impropriety, was the cause or provocation of the husband's cruelty towards her, is a question of fact; and in this case the district court has found that the cruelty practiced toward her by her husband was not induced by the wife's disobedience or impropriety, and the evidence abundantly sustains the finding. Whether

the punishment inflicted by a husband upon his wife or his harsh treatment of her because of her disobedience, impropriety, or misconduct was so far disproportionate to her offense as to be unjustifiable is a mixed question of law and fact, to be determined in any case from the particular facts and circumstances in evidence therein; and in the case at bar, if it be conceded that the disobedience of this wife or her misconduct or impropriety caused · and provoked the harsh treatment inflicted upon her by her husband, still the punishment inflicted by him was out of all proportion to her offense and affords him no justification.

3. Another contention of the appellant is that, considering the situation and relation of the parties, the husband's misconduct and cruelty toward his wife was not extreme cruelty within the meaning of section 7, chapter 25, Compiled Statutes, which provides: "A divorce from the bonds of matrimony  *  *  *  may be decreed for the cause of extreme cruelty, whether practiced by using personal violence, or any other means." The "situation of the parties" was a young wife thirty-five years of age; a husband fifty-seven, unreasonably, insanely jealous, jealous without cause or provocation, and when in a rage induced and caused by his unfortunate jealous disposition, he falsely, and without reasonable cause therefor, charges this wife with unchastity, accuses her on the public streets with being criminally intimate with other men, calls her the most vile, opprobrious, and degrading names known to the English language, and crowns the cruel treatment by beating and choking her. We think that, "considering the situation and relation of these parties," the husband's conduct was not only cruelty, but extreme cruelty within the meaning of our statute. In support of his contention appellant's counsel cite us to the following cases: *Beckley v. Beckley*, 31 Pac. Rep. [Ore.] 470; *Reed v. Reed*, 4 Nev. 396; *Shaw v. Shaw*, 17 Conn. 189; *Coulthard v. Coulthard*, 60 N. W. Rep. [Ia.] 213; *Felton v. Felton*, 62 N. W. Rep. [Ia.] 677; *Boon v.*

*Boon*, 12 Ore. 440; *Kennedy v. Kennedy*, 73 N. Y. 369; *Beach v. Beach*, 46 Pac. Rep. [Okla.] 514; *Harper v. Harper*, 29 Mo. 301; *O'Connor v. O'Connor*, 13 S. E. Rep. [N. Car.] 887; *Van Glahn v. Van Glahn*, 46 Ill. 135.

We have already referred to *Reed v. Reed*. But in that case, while the court denied the wife a divorce because the evidence established that she had provoked the cruelty of which she complained, still the court said: "There may be extreme cruelty without the slightest violence. The happiness of a life may be destroyed by a course of conduct which could furnish no ground for apprehending bodily harm or injury. * * * It is evident that much must be left to the discretion of the court and jury in determining whether certain acts, or course of conduct, amount to extreme cruelty, for it is manifest from the nature of things that acts which would be extreme cruelty under certain circumstances would not be so under others; and so, too, a course of conduct toward one person might be deemed extreme cruelty which towards another would not be so considered by any one."

In the case of *Shaw v. Shaw*, *supra*, the husband had vilely abused the wife, had charged her with adultery, and, against her wishes and remonstrances, had unreasonably exercised his authority in regard to her attending church and visiting her relatives and friends, and persisted in endangering her life by excessive intercourse, and the court said: "If this was cruelty, it was such cruelty as 'can be borne.' The unfortunate victim is to be pitied, but the law furnishes no remedy." The case is an authority for the contention that the conduct of the husband in this case toward his wife was not extreme cruelty. But we confidently say that no such a rule of law as announced by the court in the *Shaw Case* exists west of the Alleghany mountains.

Perhaps it may be also said that *Van Glahn v. Van Glahn*, *supra*, also sustains counsel's contention. But the other cases are not authority for the proposition in support of which they are cited, the facts in this case and our statute considered,

On the other hand, we think the authorities establish that a false charge of adultery made by a husband against his wife, and calling her vile, opprobrious, and indecent names, even if he forbears choking and beating her, may constitute extreme cruelty. (*Lee v. Lee*, 28 Pac. Rep. [Wash.] 355; *Wagner v. Wagner*, 30 N. W. Rep. [Minn.] 766; *Farnham v. Farnham*, 73 Ill. 497; *Jones v. Jones*, 60 Tex. 457; *Cooper v. Cooper*, 44 N. W. Rep. [Mich.] 381; *Bocck v. Bocck*, 16 Neb. 196; *Vocacec v. Vocacec*, 16 Neb. 453; *Brotherton v. Brotherton*, 12 Neb. 75; *Powers v. Powers*, 20 Neb. 529; *Heist v. Heist*, 48 Neb. 794; *Waltermire v. Waltermire*, 17 N. E. Rep. [N. Y.] 739; *Gibbs v. Gibls*, 18 Kan. 419; *Black v. Black*, 30 N. J. Eq. 215.)

In *Graft v. Graft*, 76 Ind. 136, the court said: "A husband could hardly, by any other means, cause a sensitive wife more mental pain, torment, vexation, affliction, grief, and misery than to falsely charge her with the crime of adultery, and slanderously report the same around among her neighbors; and in doing so he would certainly be guilty of great unkindness, and want of tenderness toward her. A greater violation of the marital vow to protect and defend the reputation, as well as the person, of a wife the husband could not commit than to wantonly traduce and vilify her character."

In *Smith v. Smith*, 40 N. J. Eq. 566, the court said: "A charge of incest made by a husband against his wife, persisted in without cause, attended with slight acts of violence, jealous watchings, suspicious conduct, and reasonable apprehension of bodily harm is good ground for judicial separation by a divorce from bed and board. It is not a good defense to such complaint that the husband appears to be under an insane delusion where there is not general insanity."

4. A final contention of the appellant is that the alimony awarded the wife in this case by the district court is excessive. We do not think it is. The only doubt in our minds with reference to the correctness of the decree as to alimony is whether it should not have been made

larger; and we are earnestly pressed by counsel for the appellee to modify the decree in reference to alimony and increase the amount. In support of this contention it is said that when a marriage is dissolved by reason of the misconduct of the husband the wife is, by section 23, chapter 25, Compiled Statutes, declared to be entitled to dower in his lands in the same manner as if he were dead, and that treating the wife with extreme cruelty is misconduct within the meaning of this statute, and therefore the wife was entitled to an amount of permanent alimony which would equal the value of her dower interest in her husband's real estate. Conceding that extreme cruelty is misconduct within the meaning of this statute, and that the wife by reason thereof was entitled, upon the dissolution of the marriage, to permanent alimony equal in value to her dower interest in her husband's lands, still we do not think that we can modify the district court's decree in reference to the permanent alimony awarded the wife. In the first place the wife's prayer in her petition was for permanent alimony, and not that she might be, upon the dissolution of the marriage, awarded a dower interest in her husband's lands; and she did not complain in the district court, nor does she here, that she was not given a dower interest. She must therefore be deemed to have assented to accept a sum of money equal in value to the dower as permanent alimony and in lieu thereof. (*Tatro v. Tatro,* 18 Neb. 395.) Again we cannot say from the evidence in this record but that the $5,000 of permanent alimony awarded the wife is equal in value to what a dower interest in the lands of the husband would have been. There is no fixed rule in this state for determining what portion of a husband's estate should be decreed to his wife as alimony. The amount should be just and equitable, due regard being had for the rights of each party, the ability of the husband, the estate of the wife, and the character and situation of the parties. (*Cochran v. Cochran,* 42 Neb. 612; *Heist v. Heist,* 48 Neb. 794.) We think

the decree of the district court complies with this rule. The wife is young and healthy. She has no child or children to support, and she did not contribute to the accumulation of the husband's property. The decree of the district court is in all things

AFFIRMED.

NORVAL, J., offered no opinion.