BESSIE STEPHENS, APPELLEE, V. CLAYTON H. STEPHENS, APPELLANT.

10 N. W. (2d) 620

FILED JULY 30, 1943. No. 31611.

Lamont L. Stephens, for appellant.

R. H. Mathew, contra.

Heard before SIMMONS, C. J., PAINE, YEAGER, CHAPPELL and WENKE, JJ., and TEWELL and LIGHTNER, District Judges.

TEWELL, District Judge.

This action was brought in the district court for Sherman county by Bessie Stephens, plaintiff, to secure a divorce from her husband, the defendant Clayton H. Stephens, Jr. From a decree granting the plaintiff a divorce, awarding the custody of children to the plaintiff, and also awarding the plaintiff alimony and future monthly payments for support of such children, the defendant has brought the case to this court by appeal proceedings.

The ground for divorce alleged in the plaintiff's petition is that of extreme cruelty. The defendant by his answer denies that any acts of cruelty to the plaintiff were committed by him while he was mentally competent, and alleges that any acts of violence on his part toward the plaintiff occurred subsequent to the month of June, 1941, and after he had become mentally deranged. The defendant also alleges that the plaintiff is mentally deranged and not competent to maintain this action. By his answer the defendant prays that the action be dismissed. In the defendant's brief filed in this court, no complaint is made, if a divorce is to be granted, as to the amount of alimony, or child support awarded to the plaintiff. Either by allegations and admissions in the pleadings, or by the evidence, the facts hereinafter related may properly be found to be true.

The parties were married to each other at Ord, Nebraska, on May 20, 1929, and at all times since such marriage have resided in Sherman county. Three children, all still living, were born to this union, Betty on October 23, 1930, Lyle on September 3, 1932, and Marjorie on November 10, 1940. The defendant is a farmer by occupation, and the parties have lived upon a farm during all of the time they have lived together. The contentions of the plaintiff and of the defendant, perhaps, may be best made clear by mention first of some events that are shown to have occurred during the years 1941 and 1942. One morning, in the month of June, 1941, before the defendant had arisen for the day, the plaintiff came into the defendant's bedroom, seated herself upon the bed, and told the defendant that she

did not love him any more; that she had written a few letters to another man; that she was in love with such other man, and desired to go and live with him. The facts are that the plaintiff had written three different letters to this party, all within a few months of the date of voluntarily telling her husband thereof. In these letters she asked him to come to see her. The facts also are that the plaintiff had never met the man, had never talked to him in her life, and he did not know who she was. He did not answer any of the letters. Later in 1941 the plaintiff attempted to talk to him by telephone from Omaha. When she told him who she was, he hung up the receiver. He did not at any time ever seek to get in touch with the plaintiff in any manner. It is the contention of the defendant that the things told him in the above-mentioned conversation caused him great mental worry, and that he lost sleep, became highly nervous, and mentally deranged. The evidence also shows that the plaintiff's mother has been insane and in the asylum at Ingleside for the past 22 years, except at intervals. The nature of such mother's insanity caused her to think she was in love with, and actually married to, a man other than her husband, although such other would have nothing to do with her. It is upon the above related facts that the defendant bases his contention to the effect that the plaintiff is incompetent to maintain this action.

The plaintiff testified to several acts of violence, such as slapping, choking and kicking, committed upon her by the defendant. The defendant admits some of such acts. All of such acts as are admitted by the defendant occurred after he was told of the letters to the other man. It would unduly lengthen this opinion to relate the many incidents shown by the evidence. To relate a few of the more important will suffice. Several times the defendant told the plaintiff that if she ever left him "it would just be too bad for her." In August, 1941, the defendant took the plaintiff and their three children to Ravenna, Nebraska, on a Saturday afternoon. When the defendant was about ready to go home, he could not find the plaintiff, or any of the children.

He went home without them, and found a note on the table from his wife telling him that she could not carry on, and was leaving him. He later ascertained that she had employed a trucker to take herself and children home from Ravenna, and to load nine head of defendant's cattle and haul them to Broken Bow, Nebraska, where she sold them. That night the defendant drove to where the plaintiff's sister lived in Omaha. Not finding the plaintiff there, he drove back home very early the next day, and found the plaintiff at Ansley, Nebraska, where she had rented a room in a hotel. He persuaded her to go home with him, and got from her $474 in money, that being what was left from the sale price of the cattle. On at least two different occasions subsequent to June, 1941, the defendant, in the plaintiff's presence, attempted, ostensibly at least, to commit suicide by taking poison. The poison was knocked from his hand in time to prevent its consumption by him. The plaintiff is shown to have gone to Omaha on two different occasions after June, 1941, each time with the defendant's consent. There she tried to find work for hire, and did work for a time as a housemaid. While she was there she wrote the defendant for money. He sent no money, but, instead, went to Omaha, and took the children home with him. Finally the plaintiff, at defendant's solicitation, agreed to go back to Sherman county, if the plaintiff would rent a house where herself and children could live away from the defendant. This the defendant did, and gave the plaintiff the sum of $20 per month to support herself and the children. While thus living, the plaintiff, on May 1, 1942, brought this action for a divorce. In September, 1941, the defendant went to consult Dr. Kelly, a psychiatrist, in Omaha, as he felt he was going insane. He was treated by Dr. Kelly with electric shocks for a period of about twelve days. At the end of such time the plaintiff took him home for the week-end. The plaintiff wanted the defendant to go back for further treatment, but he refused to do so. The defendant was again treated by Dr. Kelly for mental ailment from March 22 to April 15, 1942, after his father had filed a

complaint of insanity before the Commissioners of Insanity of Sherman county. This occurred just after one of the defendant's attempts to take poison.

The defendant's contention, to the effect that the plaintiff is so mentally deranged as to be unable to maintain this action, cannot be sustained. He cites no authority to sustain such contention, and we think none such could be found that would be applicable to the facts of this case. Other than proof of her mother's insanity, and of plaintiff's attempted communications with the man referred to, the record is bare of any proof of the plaintiff being other than sane. There could reasonably exist any one or more of several motives for the letters, any one of which would be that of a sane person. If a plaintiff in an action for divorce reasonably understands the nature and purpose of such action, the effect of his acts with reference thereto, and has the will to decide for himself whether or not such action should be brought, he has sufficient mental capacity to maintain such action in his own name. *Simmons v. Kelsey,* 76 Neb. 124, 107 N. W. 122. The evidence does not show the plaintiff to be insane. We need not decide the question of whether or not insanity on her part could be raised by the defendant's answer, or made a matter of defense by him.

The defendant seeks to invoke as a defense the doctrine of recrimination, and contends that the plaintiff has been guilty of such acts as to give rise in him to grounds for divorce against her, and that therefore the plaintiff's action should be dismissed. Upon this phase of the case the defendant cites the opinion in the case of *Studley v. Studley,* 129 Neb. 784, 263 N. W. 139, and other cases cited therein. The evidence in this case fails to show any applicability of such doctrine to the facts of this case. From the general tenor of the evidence and from incidents shown therein, one is justified in concluding that the plaintiff is a meek sort of person. Aside from her acts of attempting to communicate with the other man, not an incident that reflects upon her character or virtue, or that shows any cruelty to

the defendant, is shown by the evidence. The defendant's father and mother think well of, and have highly praised, the plaintiff as a housewife and mother. The plaintiff says she wrote the letters to the other party and then voluntarily told him of them, because he had many times told her that, if he desired, he could "take out" a certain schoolteacher. She seems merely to have tried to arouse his jealousy, and thereby to cause him to be more considerate of her. Misconduct on the part of the plaintiff in an action for divorce, not amounting to a statutory ground for divorce, affords no justification for punishment inflicted upon the plaintiff in retaliation out of all proportion to such misconduct. *Walton v. Walton,* 57 Neb. 102, 77 N. W. 392.

The defendant further contends that acts of violence committed by a person of unsound mind does not constitute extreme cruelty as a ground for a divorce, and cites the case of *Kirkpatrick v. Kirkpatrick,* 81 Neb. 627, 116 N. W. 499. We deny the applicability of any such rule to the facts of this case. We are not called upon to discuss the question as to what, if any, condition of insanity on the part of the defendant would prevent actual acts of violence by him against the plaintiff from constituting extreme cruelty. There is ample evidence of extreme cruelty on the part of the defendant toward the plaintiff having existed long before the letters were written to the innocent man she involved in her domestic troubles. It is not even contended that the defendant did not have the mental capacity to form an intent, if such be required to constitute extreme cruelty, to injure the plaintiff at the times he either slapped, choked or kicked the plaintiff or pulled her hair, after he knew of the letters to the other man. The plaintiff testified that as early as 1930, within a year after the marriage, the defendant forbade some of her relatives to come upon his farm, and chased them away with a shotgun; told her that her youngest brother was no good, and told the plaintiff many times that she was just like her "damned old mother." In 1934 the plaintiff says the defendant did not speak a pleasant word to her for about two weeks. From the testimony

of the plaintiff, the defendant is shown many times to have told her that "If you think so damn much of your relatives, go live with them." We do not have the advantage of having seen and heard the witnesses, as did the trial court, but we glean from the record that the defendant lived upon the farm with his wife from 1929 to 1941, was inconsiderate of her, and regarded her much the same as one of his chattels, always insisting upon having his own way about his daily life. Then, when told of the letters which plaintiff had written, the seedbed of domestic trouble, which his own conduct had generated, burst into an uncontrolled rage. He then began to fear that he might, without compensation, lose one of his chattels, and resorted to such devices as threatening suicide, slapping, choking and kicking the plaintiff at various times. Such conduct, when not reasonably necessary to prevent an immediately impending harm, is not prevented from being extreme cruelty, merely because the sane perpetrator was highly nervous from lack of sleep and worry. *Walton v. Walton, supra.*

For the reasons above stated, the decree of the trial court is affirmed.

AFFIRMED.