FRANK G. DAFOE AND ALBERT N. DAFOE, ALSO KNOWN AS AL N. DAFOE, AN INCOMPETENT PERSON, THROUGH AND BY FRANK G. DAFOE, HIS SON AND NEXT FRIEND, APPELLANTS, V. WILLIAM R. DAFOE ET AL., APPELLEES.

69 N.W. 2d 700

Filed April 8, 1955. No. 33676.

*Ernest F. Armstrong, Dwight Griffiths,* and *Robert S. Finn,* for appellants.

*John H. Binning, Flansburg & Flansburg, Max Kier, Raymond B. Morrissey, Otto Kotouc, Jr.,* and *Beghtol, Mason & Anderson,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

On April 18, 1953, a petition was filed in the district court for Johnson County designating "FRANK G. DAFOE and ALBERT N. DAFOE, also known as AL N. DAFOE, an incompetent person, through and by FRANK G. DAFOE, his son and next friend," as plaintiffs, and designating William R. Dafoe, Virginia B. Dafoe, and others as defendants. Frank G. Dafoe will be hereinafter generally designated as Frank, William R. Dafoe as William, Virginia B. Dafoe as Virginia, and Albert N. or Al N. Dafoe, as Albert. The action, insofar as important here, was in equity seeking to cancel and set aside certain deeds and conveyances of real and personal property executed and delivered by Albert to his son, defendant William, and defendant Virginia, his wife, on July 15, 1952, as consideration for a written agreement executed by them and him to support Albert, the father, for the balance of his life, or executed by way of gift by Albert to them; to obtain an accounting and restitution, or in the alternative to impose a trust upon the property and money involved, and preserve same until a guardian could be appointed for Albert; and for general equitable relief. Such relief was sought upon the ground that Albert was 82 years of age, "in poor physical health, mentally ill and for a period exceeding 3 years has been mentally incompetent and incapable of conducting his own affairs and managing his properties and that said Albert N. Dafoe was physically and mentally incompetent at all times mentioned hereinafter." It was sub-

sequently alleged that Albert was mentally incompetent to execute the instruments involved on July 15, 1952, and that they were the result of undue influence and duress, exercised by defendants William and Virginia, who allegedly dissipated the property conveyed, and breached the agreement given as consideration therefor.

On May 22, 1953, an amended petition was filed containing two separate causes of action with comparable material allegations made and comparable relief sought. Thereafter, on May 23, 1953, Albert filed a special appearance, "for the sole and only purpose of objecting to the jurisdiction of said court over his person * * * for one or more of the following reasons, to-wit: 1. That said Albert N. Dafoe did not consent to the bringing of said action. 2. That in truth and in fact the interests of said plaintiff Frank G. Dafoe and Albert N. Dafoe are adverse in said action. 3. That no proper and sufficient service of summons has been had upon said Albert N. Dafoe."

On November 25, 1953, such special appearance, together with special appearances of William and Virginia, which do not appear in the record, were submitted and overruled by the trial court and said parties were given 2 weeks to plead further or answer.

Thereafter, on December 7, 1953, defendants William and Virginia filed a demurrer upon the grounds that: "1. The Court has no jurisdiction of the persons of these defendants. 2. The Court has no jurisdiction over the subject matter of this action. 3. The plaintiffs have not legal capacity to sue. 4. There is a defect of parties plaintiff. 5. The petition does not state facts sufficient to constitute a cause of action in favor of the plaintiffs and against these defendants." On December 28, 1953, such demurrer was submitted and overruled, and defendants were given 2 weeks within which to answer.

On January 11, 1953, Albert and defendants William and Virginia filed separate identical answers respectively admitting that in consideration of the agreements

made by William and Virginia, said Albert transferred the property described in plaintiffs' petition to William and Virginia. They then respectively denied "all and singular the allegations of the plaintiffs' petition not specifically admitted herein." Other named defendants also filed separate answers, the substance of which is unimportant here. After trial on April 13 to 16, 1954, inclusive, whereat voluminous oral evidence was adduced and numerous exhibits were offered and received in evidence, the trial court rendered a judgment finding and adjudging the issues generally in favor of all defendants and dismissing the action, with all costs taxed to plaintiff Frank G. Dafoe. Plaintiffs' motion for new trial was overruled, and an appeal was taken to this court. It is conceded, however, in this court, that the evidence warranted the finding and judgment of the trial court in favor of all defendants except defendants William and Virginia. Thus this appeal will be considered as involving only that part of the judgment in favor of them.

Some 19 alleged errors are assigned in brief of plaintiffs' counsel, but they may be summarized as contending that the trial court's judgment was not sustained by sufficient evidence but was contrary thereto and contrary to law and the principles of equity. Upon trial de novo under elementary rules with relation thereto, we conclude that the assignments should not be sustained, and as hereinafter set forth, state and discuss specific reasons for such conclusion.

The record discloses that Frank, the alleged next friend of Albert, is his son, whose mother was Albert's deceased first wife. That son is 53 years of age and lives with his wife Georgie on his farm near Tecumseh. He has been deaf since birth but has learned to speak. However, at time of trial he had no false teeth which fit him and could not be well understood without them, so by stipulation he testified by written questions and answers. He was called as a witness by plaintiffs' coun-

sel but gave no testimony which could in the slightest support or sustain any material allegations of plaintiffs' petition. There is no evidence in this record specifically detailing how much property or money Albert had given to his son Frank during his lifetime and prior to filing of the instant case. Adequate records thereof were concededly at hand but were never produced by plaintiffs' counsel. In such connection, it is conceded that on April 7, 1953, 11 days before this action was filed and 9 months after July 15, 1952, when the instruments involved were executed, Frank, then owing his father Albert $6,338, settled with his father in full for $3,000. Further, the record discloses that the father had already given him a farm and a lot of property and money. In any event, in the light of the allegations of plaintiffs' petition and the evidence in this record, Frank had no right or interest in the propery involved except a prospective interest or right to inherit as an heir, if any of such property or money was restored and remained after the death of his father. This is not a guardianship proceeding as in Cass v. Pense, 155 Neb. 792, 54 N. W. 2d 68, and Frank had a mere expectancy or possibility, a mere hope or anticipation that he would then receive some of such property. In that situation, we are first confronted with the question of whether or not Frank as an individual in his own behalf had any right or interest for the protection or vindication of which he could invoke the jurisdiction of the court in this case. We conclude that he did not have any such right or interest. Contrary to plaintiffs' contention, the transcript and evidence disclose that such question was appropriately raised in the proceedings and directly disposed of by the trial court.

Section 25-301, R. R. S. 1943, provides: "Every action must be prosecuted in the name of the real party in interest, except as otherwise provided in section 25-304." The exceptions contained in the latter section have no application here.

As early as Kinsella v. Sharp, 47 Neb. 664, 66 N. W. 634, reaffirmed as late as Gregory v. Pribbeno, 143 Neb. 379, 9 N. W. 2d 485, we construed and applied section 25-301, R. R. S. 1943, as meaning that: "The real party in interest is the person entitled to the avails of the suit." Plaintiff Frank G. Dafoe individually was clearly not entitled to any avails of the suit at bar.

In Davies v. De Lair, 148 Neb. 395, 27 N. W. 2d 628, we said: "As stated in 47 C. J., Parties, § 30, p. 21: 'For a standing as party plaintiff it is necessary, not only that plaintiff have a legal entity or existence, and that he be possessed of legal capacity to sue, but also that this person have, in the cause of action asserted, a remedial interest which the law of the forum can recognize and enforce. It is a rule of universal acceptation that to entitle any person to maintain an action in court it must be shown that he has a justiciable interest in the subject matter in litigation, either in his own right or in a representative capacity.'

"And in 39 Am. Jur., Parties, § 9, p. 858: 'Assuming the legal existence of the proposed plaintiff and his legal capacity to sue, the next question is whether he possesses any right for the protection or vindication of which he may invoke the jurisdiction of the court. As a general rule, one having no right or interest to protect cannot invoke the jurisdiction of the court as a party plaintiff in an action.'

" 'Equity will not interfere with a judgment, on a mere showing of a nominal or technical violation of the plaintiff's rights; substantial injury must be shown.' Van Every v. Sanders, 68 Neb. 509, 95 N. W. 870.

"For as stated in 39 Am. Jur., Parties, § 10, p. 859: '* * * courts are instituted to afford relief to persons whose rights have been invaded, or are threatened with invasion, by the defendant's acts or conduct, and to give relief at the instance of such persons; a court may and properly should refuse to entertain an action at the

instance of one whose rights have not been invaded or infringed, * * *.' "

Further, as stated in 26 C. J. S., Descent and Distribution, § 61, p. 1085, citing numerous authorities: "Any prospective interest, or right to inherit, as an heir is a mere expectancy or possibility, a mere hope or anticipation. An expectant heir cannot on the basis of his expectancy maintain an action during the life of his ancestor to cancel a transfer made by such ancestor.". The foregoing rules are applicable and controlling here. Therefore, we conclude that Frank G. Dafoe could not individually maintain this action as plaintiff in his own behalf. Defendants William and Virginia, and Albert as well, also presented and argued other reasons in their briefs why Frank could not do so, but they require no discussion.

This is not a case where the grantor or his duly qualified representative brought the action alleging mental incompetency, undue influence, or breach of agreement to support, as in cases relied upon by plaintiffs' counsel. This was an action brought by Frank as next friend of Albert, allegedly incompetent, wherein Albert at all times, in the district court and this court, ratified and confirmed that the instruments involved were validly executed; denied that he was incompetent; alleged that he did not consent to the bringing of the action; and denied or repudiated the right of Frank to bring, control, and maintain the action as his next friend, as did also defendants William and Virginia. Contrary to plaintiffs' contention, the question is also presented then of whether or not, in the light of the pleadings and evidence, this action could be so controlled and maintained by Frank as next friend. We conclude that it could not.

In Stephan v. Prairie Life Ins. Co., 113 Neb. 469, 203 N. W. 626, this court said: "It is a general rule that, where a person is actually insane, but has not been judicially so declared, both actions at law and suits in equity may be maintained on his behalf by his next

friend. The authorities are also harmonious in holding that, in all cases where a person is not actually insane, but is incapable, through age or weakness of mind, to conduct his own affairs, suits may be maintained on his behalf by his next friend. But it has been held that it is in the discretion of the court to allow an action so instituted to proceed or not, and it may order a stay of proceedings to await the due appointment of a general guardian, or order the same to be discontinued, as it may be advised. 14 R. C. L. 611, sec. 63." See, also, Wager v. Wagoner, 53 Neb. 511, 73 N. W. 937.

In 44 C. J. S., Insane Persons, § 144, p. 311, citing numerous authorities, it is said: "In the absence of anything to the contrary, the consent of an insane person to his representation by next friend will be presumed. Since the right of a next friend to prosecute a suit is limited, the person sought to be represented has a right to repudiate the interference. The jurisdiction of the trial court to entertain the suit by next friend, however, is not ousted by the objection of the person represented. In such case, the court should inquire into the mental condition of the person in order to determine the propriety of allowing the next friend, rather than the person he assumes to represent, to control the proceeding." Here, Albert and defendants William and Virginia repudiated Frank G. Dafoe's interference, and Albert's consent would not be presumed.

Rather, in such cases the presumption is otherwise. As stated in Howard v. Howard, 87 Ky. 616, 9 S. W. 411, 1 L. R. A. 610: "The law presumes all persons to be of sound mind, and if adults, capable of managing their own affairs; and the mere fact that it is alleged by a person styling himself next friend, that a particular individual, who is an adult, is of weak or unsound mind, and not capable of taking care of his own affairs, does not destroy that presumption." See, also, Cort v. Benson, 159 Iowa 218, 140 N. W. 419.

The applicable and controlling rule here is that in

order to sue as a next friend, where the alleged incompetent controverts the right of the next friend to act in his behalf, the plaintiff must plead and prove by a preponderance of evidence that at the time of bringing the suit, the person on whose behalf he sues: (1) Does not reasonably understand the nature and purpose of the suit; (2) does not reasonably understand the effect of his acts with reference to the suit; and (3) does not have the will to decide for himself whether or not the suit should be brought and prosecuted. Upon failure to establish such criteria, a next friend cannot maintain an action. In Simmons v. Kelsey, 76 Neb. 124, 107 N. W. 122, this court said: "It is urged that the suit should have been abated because the plaintiff lacked sufficient mental capacity to maintain it. The evidence shows that the plaintiff is a woman about 80 years of age. It is not at all surprising that, when her mental capacity is called in question, there should be abundant evidence showing that she lacked the intellectual strength and vigor that she once possessed. But that falls far short of proving that she is mentally incompetent to maintain this suit. As was said in English v. Porter, 109 Ill. 291: 'Although the mind of a person may be to some extent impaired by age or disease, still, if he be capable of transacting his ordinary business—if he understands the nature of the business in which he is engaged, and the effect of what he is doing, and can exercise his will with reference thereto—his acts will be valid and binding.' See Emerick v. Emerick, 83 Ia. 411, 13 L. R. A. 757, and notes. The evidence satisfies us that the plaintiff reasonably understood the nature and purpose of her suit, the effect of her acts with reference thereto, and had the will to decide for herself whether or not it should be brought and prosecuted. That, we think, is sufficient mental capacity to maintain the action." See, also, Stephens v. Stephens, 143 Neb. 711, 10 N. W. 2d 620.

Further, in In re Estate of Isaac, 108 Neb. 662, 189 N.

W. 297, which involved the appointment of a guardian
ad litem for an alleged incompetent, this court said:
"To justify such an appointment, which may have the
effect to deprive a person of the control of litigation in
which his interests may be largely involved, the fact
of incompetency should be specifically alleged, and the
court should be satisfied from the proofs that the status
of incompetency actually exists at the time the appoint-
ment is made. A finding of incompetency should be
made. Patton v. Furthmier, 16 Kan. 29; Spencer v.
Popham, 5 Redf. Sur. (N. Y.) 425; Patton v. Taylor,
144 Ark. 254; Ex parte Trice, 53 Ala. 546. The court
did not find that Lucy Isaac was incompetent, but
merely found that a petition had previously been filed
in that court for the appointment of a general guardian
for her, on the ground of mental incompetency. This
was insufficient ground for the appointment. * * * A
great deal of testimony was taken in the district court
in the case at bar, as to whether she was ever in fact
incompetent. That court found that she was sane, and
the evidence, though in sharp conflict, is sufficient to
support the finding."

Contrary to the contentions of Albert and defendants
William and Virginia, we conclude that the allegations
of plaintiffs' petition with regard to incompetency of
Albert at the time of bringing the action and thereto-
fore were sufficient, although not so specific as to be
designated a perfect plea. Bearing that in mind, to-
gether with the rules heretofore set forth, we have
examined the record. Insofar as important here, it dis-
closes as follows: Albert was a man 82 years of age,
who had for many years been a lawyer and also en-
gaged in the real estate, insurance, and banking business
at Tecumseh. On July 15, 1952, he owned certain de-
scribed real and personal property, including 121.79
shares of stock in the Johnson County Bank of Tecumseh.

William is also Albert's son, whose mother was Al-
bert's deceased second wife. He was 32 years of age

at the time of trial. He was married and had two young children. He had been interested in biochemistry, genetics, and other related sciences, as well as the general advertising and publishing business, and did not want to be a lawyer. Nevertheless, his father urged him to become a lawyer, so, after attending Nebraska Wesleyan University, he attended the universities of Michigan and Nebraska. He was graduated in law at the latter institution in 1950. In the meantime he served 9 months in the army and worked 3 months on a surveying crew. He and his family lived in Ann Arbor, Michigan, from 1944 to 1948. During that period the necessaries for himself and wife were furnished by himself, his wife who was employed for about 2 years, and by Albert his father. He was not there employed but had collected a personal injury judgment for $7,650, and his wife earned more than $4,000. They used these sums and his father made up the difference required for their support. They lived at Norfolk for a short time in 1949.

After William's graduation in 1950 he wanted to go to New York, Philadelphia, Chicago, or some other large city, but his father insisted, as did his half brother Frank, that he was obligated to return to Tecumseh and be with his father. He did so, where he and his family lived with his father in a residence owned by the father and he and his father became associated together as lawyers in the firm of Dafoe and Dafoe, with offices located in his father's building. By agreement, their offices were renovated and improved at Albert's expense. The father's home was improved and they bought a few pieces of furniture, including a television set, at Albert's expense, and Albert generally furnished the money necessary for groceries, household, and other expenses. William obtained a little law practice, and collected a few legal fees. At the request of Albert, he ran for county attorney, at his father's expense, but was not successful. He never represented his father as

a lawyer. His father took care of his own business, but once in a while he would ask William about business matters. In April 1952 William, his wife Virginia, and their two children, together with Albert, moved to Lincoln, where, except for a short time, they all lived together at 1944 South Cotner Boulevard.

Plaintiffs' counsel has laid great stress upon the total amount of money received by William and Virginia, or expended by the father in their behalf over the years. In that connection, Albert kept a daybook in his own handwriting, recording and reciting therein his daily financial transactions. He included among such transactions money paid to or for William or Virginia and to or by the firm of Dafoe and Dafoe. In that connection, plaintiffs' counsel offered in evidence one such daybook covering entries from January 1, 1949, to March 29, 1952, which was received in evidence after proof by plaintiffs' own witness that it correctly reflected the facts. Such evidence is important here in the light of plaintiffs' petition filed April 18, 1953, which alleged that Albert was "mentally ill and for a period exceeding 3 years has been mentally incompetent and incapable of conducting his own affairs and managing his properties." In other words, such evidence was and is competent to be considered by the court as a refutation of such allegations.

Georgie Dafoe, the wife of Frank, was called as a witness by plaintiffs' counsel. She testified that in 1951 she had several conversations with Albert and he had trouble remembering things. He sold some land which he owned in Nemaha County, and the next day inquired about how much had been sold, where it was located, and the price received; and later seemed confused about where or how he was to get to Hitchcock County where some of his other land was to be sold. The day after the sale he told the witness and her husband that he was afraid he was going to have trouble with William and Virginia; they were not satisfied, and

she was cruel to him. In January 1952 he said that William had struck him, and he was not going to stand for such treatment. However, on cross-examination Georgie testified that Albert always knew that he had two sons; that he always knew the extent of his farms, bank stock, and other property, and that he knew how property was transferred, by deed, court sale, or lease. She also testified that he had given them an equity in a farm and money on several occasions, and said that they had kept complete book and check records of all of it, which she would attempt to disclose the next morning, but she did not do so.

Plaintiffs' counsel called several lay witnesses who knew Albert at Tecumseh. One of them, a retail clothing merchant, testified he noticed that Albert had a tendency to be forgetful. In the late fall of 1951 he bought two pair of rubbers the same day, paying cash therefor. They were next door neighbors and discussed the boundaries of their property, which Albert knew about. They never did discuss Albert's sons or the nature and extent of his property or about the usual manner of transferring property.

A farmer testified that on March 1, 1950, he wanted to renew a mortgage on his farm, but Albert seemed forgetful and neglected to take care of it, so with the assistance of another attorney it was negotiated with the then holder of the mortgage. In January 1950 Albert sold him an insurance policy on his property for a term of 3 years. In January 1951 Albert thought it had lapsed and wanted to renew it. In the summer of 1951, the witness had a $10 loss which was unpaid until January 1954, although Albert said he had sent the claim in. Other transactions with Albert were not unusual, and the witness had no knowledge whether or not Albert knew the objects of his bounty, the extent of his property, or the manner of transferring property.

A clothes cleaner sold Albert two suits of clothes in 1949 and one in 1950. He kept them cleaned for Al-

bert. Early in 1950, the suit worn by Albert was unfit for further service, and he had forgotten that the other two suits were hanging in a closet at home. They never discussed Albert's two sons, the nature and extent of his property, except a small part which the witness wanted to buy, or the manner in which property was transferred.

A retail lumber man bought a lot from Albert on April 27, 1950. He traded him one lot for another and paid the difference in cash. It was handled by Albert's lawyer, and afterward Albert was confused about which lot was which, until they visited the lots. As a lumber customer, Albert sometimes misplaced the statements sent to him. However, the witness testified that Albert was at all times perfectly able to transact business and perfectly able to transfer property when his lawyer was with him.

A grocer testified that Albert did business with him and had a charge account the past several years before moving to Lincoln. About 3 months before that time, Albert telephoned an order, then forgot and telephoned the same order several times again. Sometimes over the years Albert paid his bill, and forgetting, offered to pay it again. In August or September 1951, Albert renewed a policy of insurance on a warehouse belonging to the witness who wanted the policy changed in some respects. Albert noted the changes but did not make them, having misplaced the memorandum, so the next day the witness went to Albert's office where the transaction was completed. The witness did not know whether or not Albert always remembered his sons or knew the nature and extent of his property or knew how property was transferred, and he did know what Albert's mental condition was on July 15, 1952.

A farm manager served several years with Albert as officers of a cemetery association. In February 1951 they had a business meeting to determine the manner of reinvestment of cemetery funds. Albert wanted them invested in farm mortgages, but the board decided to put

the money in a building and loan after which Albert seemed confused about the purpose of the meeting. However, after explanations by the secretary, everything was all right. In 1950 Albert temporarily misplaced some cemetery bonds that were in his possession, but Albert's secretary found them in his office. The witness never had any business transaction with Albert and expressed no opinion with regard to his incompetency then or thereafter.

A garage owner testified that Albert had been his customer since 1941 when he bought his 1941 Plymouth car and drove the same car from that time until he left for Lincoln in 1952. Albert wrote their annual bond for a motor vehicle dealer's license until 1949, when he neglected to furnish it, so it was obtained elsewhere. During the last 3 or 4 years, upon several occasions Albert misplaced or could not find his car keys, so they would order another set. The witness believed that Albert knew at all times that he had two sons. However, he did not know whether or not Albert knew the nature or extent of his property or about transferring property, and the witness had no idea what Albert's condition was on July 15, 1952.

A life insurance man, who formerly traveled for an equipment company, sold Albert a steel crib delivered September 25, 1948. When the bill was presented for payment October 1, 1948, Albert denied that he had ordered it. However, after contacting his tenant, Albert paid for the equipment. That was the only transaction with Albert the witness ever had. He did not know whether or not Albert knew that he had two sons, or knew the nature and extent of his property, or knew how to transfer property, by deed or otherwise, and he had no idea what Albert's condition was in 1952.

An implement man testified that once in 1950, Albert's car had collided with a car and asked if it was one belonging to the witness or to one of his sons. An inquiry developed that the car belonged to another man. That

was explained to Albert and he left, but returned several times making the same inquiry. About a month later, Albert came to the implement house looking for a man who had been working there. He was told that the man was working at another building, but afterward Albert came back several times making the same inquiries. The witness had not talked with Albert since the spring of 1950, and he would have no way of knowing his condition on July 15, 1952, or at the time of the trial.

A witness who once farmed land managed by Albert testified that every fall he paid Albert the cash rent. Once he paid him $80. It was laid on the corner of Albert's desk, and he got it confused with $40 or $50 lying on another corner of his desk, and said the witness had not paid him enough. Once in 1950 he settled with Albert, who paid him $15, and thereafter three or four times attempted to pay it again. The witness also said that he saw Albert out at his farm in the fall of 1952, which evidently was not true, and contrary to his testimony that Albert did not manage the farm in 1952. Further, the witness did not know whether the previously recited events took place in 1949, 1950, or 1951.

A man engaged in the poultry and feed business in the building next door to the Dafoe and Dafoe law office building testified that in the summer of 1951, Albert came in wanting him to check the roof on his buildings. That was done and Albert was told the condition, but he came back two or three times to inquire again about what their actual condition was. In 1951 Albert had three or four bunches of keys on chains. He sometimes tried to lock or unlock the door east of his own office, and sometimes could not find the right key to his car. Once when his ignition keys had been misplaced, they were found by the witness in Albert's office. In the summer of 1951, Albert would sometimes ask what date it was and upon being told would later return to verify it. He usually parked his car in front of his office and would have difficulty backing out of the narrow drive-

way. The witness testified that he did not know whether or not Albert realized that he had two sons, or knew the nature and extent of his property, or knew how property was transferred, and that he had no way of knowing Albert's condition on July 15, 1952.

A farmer testified that Albert was agent for his landlord until the spring of 1951. In April 1951, Albert talked with him about sealing some corn, and Albert wrote on a piece of paper the amount of corn, together with the location and description of the land. In doing so, Albert wrote northwest quarter of section 28, and the witness corrected that part to read northeast quarter of section 28. Albert also wrote white corn, and the witness corrected it to read yellow corn. Albert then left, but, having misplaced the piece of paper, drove back and made a new memorandum. Afterward, Albert called the witness several times about the transaction. In the spring of 1949, the witness called at Albert's home where he was confined by an accident. He was doing his office work at home and the dining room table was littered with papers and a government check for about $2,000 had fallen to the floor. The last time the witness ever saw Albert was in the summer of 1951. He testified that he had no way of knowing whether or not Albert knew the nature and extent of his property, but he always did know that he had two sons and always knew how to transfer property, by will or deed or something like that.

A garage mechanic testified that in early winter or late fall of 1951 he was sent up to Albert's house to start his car. Albert said that he had lost his ignition key and was trying to start the car with one which did not fit. The witness found the proper key on Albert's key ring and started the car. The witness testified that on about three occasions Albert forgot where he had parked his car. However, the last time the witness ever saw Albert was in the early winter of 1951 and he never discussed his family, his property, or the manner or

means of transferring property, and knew nothing about Albert's condition on July 15, 1952.

A deputy county clerk testified that for 3 or 4 months prior to moving to Lincoln, Albert came to his office almost every day and checked the chattel mortgage and real estate records for a half hour or more, without first looking at the indexes. Also, sometimes Albert did not put some of the records back in their right numerical order. Once he started to walk out with another man's hat, but was called back to find his own on the counter. Sometimes he said "I wonder what I came over for?" It was brought out, however, that such records were kept in chronological order and could be readily checked daily without first going to their index, and it was not unusual for people to misplace numerical books after using them. The witness knew nothing about the condition of Albert on July 15, 1952, and expressed no opinion with regard to his mental competency at any time.

A physician engaged in the general practice of medicine at Tecumseh was called as a witness by plaintiffs' counsel. He first examined Albert on September 21, 1950. He diagnosed and thereafter treated Albert upon several occasions for an irregular heart until in January 1952. In February 1952 he referred Albert to a Lincoln physician for examination, after which time until March 28, 1952, Albert was treated by the witness for arteriosclerosis or hardening of the arteries involving the brain, which caused Albert to be confused and unable to remember recent events clearly. The treatment for such disease was said to be largely prophylactic, although vasodilating drugs are used to increase the blood supply, and such cases are usually referred to a psychiatrist for treatment. The witness testified he knew that such condition existed as early as April 1950 by observation in a business transaction in which the physician then purchased a lot from Albert. At that time, however, he felt that Albert was competent to transact business after things were thoroughly explained to him

and cleared by counsel. However, he testified that the disease was progressive in character, thus Albert's memory of recent events was shorter when he was last seen by the witness on March 28, 1952, and he testified that on July 15, 1952, he was of the opinion that Albert would not have been mentally capable of transacting business. His opinion was based upon the criteria that in order to have the mental capacity to transact business, Albert would be required to have good or sound business judgment, good insight, be able to know and remember his physical assets and their value, have mental clarity, ability to think properly, and have a keen insight not ravaged by any disease processes. However, the witness testified that he knew Albert never forgot that he had two sons. The witness and Albert never discussed the manner in which property was conveyed, except with regard to his own transaction in April 1950. After that time, however, the witness did discuss with Albert the nature and extent of some of his property, and "he knew what they were."

A Lincoln lawyer who was a friend of the Dafoe family was called by plaintiffs' counsel as a witness. He had represented William in an automobile accident case and obtained a judgment in his favor for damages, which was paid to and used by William as heretofore mentioned. On February 9, 1952, at which time the witness represented Frank, a nurse at St. Elizabeth Hospital in Lincoln called the witness, saying that Albert wanted him to come and see him. In the afternoon he and another member of his firm went out there. Neither of such lawyers at that time or since ever represented Albert as his lawyer. Albert had recently been taken to the hospital and treated there because he had received several broken ribs in an accident. He did not look well and the witness had no knowledge with regard to the medication which Albert had been receiving. However, Albert recognized the witness, knew that he was a lawyer, and said that William was trying to get his property. He wondered

why he was being kept in a hospital, said he thought Virginia was responsible for it, and spoke. disrespectfully of her. Also, in the course of the conversation he wanted to know what hotel he was in and talked about being in Omaha, whereupon his whereabouts were explained. He said that he had prepared a will or had one prepared by a lawyer, and was confused about whether or not he had one. Albert was told by the witness that if he ever wanted him to just call his law office and if he was not there to ask for some other named member of the firm, whereupon Albert replied, "Sure I remember them now." In November 1951 the witness had received a letter from Albert saying in substance that he was going to fix it so that Frank and William got an equal share of his property and wishing that he would be employed by Frank to help look after Frank's interest in the estate. The witness expressed no opinion whether or not Albert was mentally competent at any time.

Another Lincoln lawyer who represented Albert in the transactions here involved but withdrew as an attorney for Albert before the trial was called as a witness by defendants. He was first consulted by Albert at Albert's office in Tecumseh during the latter part of March 1952, with regard to disposition of his property. The lawyer pointed out to him the advantages of a trust, and advised him to so dispose of it, but Albert said that it was not what he wanted to do; and that he and William had been very close, and having reached a point in life where he did not want to be bothered with looking after his property which he described, he knew William would look after it, and he wanted to transfer his property to William who would agree to support him and care for him the rest of his life. The lawyer then suggested that Albert write him a letter telling him what he wanted to do. Thereafter, on April 12, 1952, Albert wrote the lawyer a 10-page letter, all written and signed in his own handwriting. Appearing in the evidence it de-

clared that he was in good physical condition and entirely competent in every way to take care of his affairs, although getting forgetful in small matters, and reaffirmed his former position that he did not want a trust agreement or conservator, or any outsider handling his property, but wanted to transfer all of it to William and have William agree to take care of him the rest of his life. The letter generally described all of Albert's property and the location thereof, recited some of his monetary obligations, declaring how he wanted them paid. It recited in detail and exactly what disposition he wanted to make of all his property, and called attention to his lack of confidence in his son Frank, who was, he believed, easily influenced and would not properly care for him. It recited that he had already provided for Frank by setting him up in farming and giving him help in many other ways. Later, the lawyer had several conversations with Albert in his office in Lincoln, and talked with him a few times over the telephone about minor matters. As a result, and at Albert's direction, the instruments here involved were prepared. On July 15, 1952, in the offices of the witness, they were read and explained to Albert in the presence of a psychiatrist and a physician in Lincoln, who had theretofore examined him to test previous threats made by Frank and others to contest his mental competency. The witness testified that Albert was then capable of transacting business, knew the objects of his bounty, the nature and extent of his property, the manner in which property is transferred, and the nature and effect of the instruments which were then and there voluntarily signed, acknowledged, witnessed, and delivered.

The psychiatrist testified as a witness for defendants. His educational qualifications and extensive training as an expert with many years of experience in the fields of psychiatry and neurology were not disputed. He first examined Albert in his office in Lincoln on April 7, 1952. Albert was then given a physical, psychiatric,

and neurological examination. He was cheerful and cooperative. He said he had been sleeping well and had a good appetite. He did complain that his chest hurt at times, admitted some difficulty with his memory, and that he was becoming hard of hearing. He said that he was born November 23, 1871, came to Nebraska in 1879; that his father was a doctor; and that the famous Doctor Dafoe in Canada was his second cousin. He stated that he was admitted to the bar in 1902, but had done little trial work, mostly partition suits and sold real estate and insurance. He described generally the property owned by him, together with the location thereof, and stated the approximate value of his bank stock. He stated that his son Frank was a son of his first wife, deceased, and William was a son of his second wife, deceased. He also said "I have already given Frank a farm * * * I want to give Bill a deed giving him the balance of the estate provided he takes care of me the rest of my life. I have given Frank a lot already." The physical examination disclosed that Albert had an impairment of hearing, arteriosclerotic changes of the aortic vessels, with an extra heart beat every fourth beat; a blood pressure of 150 over 75; pulse rate of 64; and no loss of coordination. There was also some evidence of moderate aortic changes in the cerebral vessels, which might affect recent memory. Otherwise, for a man his age, Albert's physical condition was good, quite satisfactory. The psychiatrist also again saw Albert in his office on July 14, 1952, and in the lawyer's office on July 15, 1952. The psychiatric examination disclosed that Albert was oriented for time, place, and person, but was unable to recall some recent tests, names, and events. He did not show any abnormal emotional state or evidence any feeling of persecution or delusions. He was a fairly settled, rigid type of individual, without any emotional instability, and a person who could not be easily influenced. He had a simple senility with no evidence of senile dementia or cere-

bral sclerosis or phychosis from cerebral arteriosclerosis. He knew and named his two sons, described his property, knowing the location, nature, and extent of it, and again said, " 'I want all of my property to go to William, then he will take care of me during my lifetime.' " The witness testified that Albert then had sufficient mental capacity to convey property. On July 15, 1952, the witness asked Albert if he understood what he was doing, and he said, "yes, he was making out or entering into a contract, he was making deeds to carry it out." When asked again what he desired to do with his property, he said "he wanted to leave it to William." He was asked the extent of his property, and again generally described and located it correctly. He again also said that he had "two sons, Frank and Bill." Again the psychiatrist gave an opinion that Albert was mentally competent to convey property and understood the nature and effect of the documents signed by him on July 15, 1952. The witness testified that arteriosclerosis was progressive and not regenerative, but that its degree and development depended upon the individual case. Further, he testified that the process may be delayed and mental competency improved by better nutrition, dilation of the blood vessels by medication, and stimulation of brain function, by giving recent newly discovered chemicals in connection therewith.

In the light of the foregoing rules and evidence, we do not find in the record sufficient competent evidence to sustain a conclusion that Albert was at any time mentally incompetent to bring, control, and maintain this suit. Therefore, we also conclude that Frank had no right to bring, control, and maintain this action as next friend of Albert. In the light of such conclusions, it becomes unnecessary to discuss or decide the issues of alleged undue influence or breach of the agreement by William and Virginia.

For reasons heretofore stated, we conclude that the

judgment of the trial court should be and hereby is affirmed. All costs are taxed to Frank G. Dafoe.

AFFIRMED.