ROSALEE SCHALK, APPELLANT, v. EDWIN SCHALK, APPELLEE.
95 N. W. 2d 545

Filed March 20, 1959. No. 34520.

230

*Wellensiek & Morrissey,* for appellant.

*Moran & James,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff, Rosalee Schalk, filed a petition in the district court for Otoe County, seeking an absolute divorce from defendant, Edwin Schalk, and the custody of their minor children, together with an allowance for their support, alimony, attorneys' fees, and costs. Plaintiff's petition alleged in substance that defendant had been guilty of extreme cruelty by continuously quarreling with, abusing, and using abusive language toward plaintiff; and that defendant had failed and refused to support her and the children after telling plaintiff to leave their home and never return. A hearing on plaintiff's motion for temporary allowances followed, and on January 25, 1958, the trial court ordered defendant to pay $10 a week as child support until further order of the court, and ordered defendant to pay $15 suit money and $50 temporary attorneys' fees.

Thereafter, defendant filed an answer, the substance of which was to deny generally and deny that he had failed to support plaintiff and the children up to the time plaintiff voluntarily left their home. Defendant also alleged that any quarrels with plaintiff were justi-

fied as the result of conduct of plaintiff in associating with unnamed persons over objections of defendant, which associations were not in the best interests of their children, whose interests would allegedly be best served by giving their custody to defendant. However, defendant's prayer was simply for dismissal of plaintiff's petition. Plaintiff's reply was a general denial.

After a trial on the merits, a decree was rendered which found and adjudged that plaintiff had failed to prove a cause of action for divorce, and dismissed her petition. Costs of suit were taxed to defendant, but plaintiff was denied any allowance of additional fees for the services of her attorneys. Plaintiff's motion for new trial was overruled, and she appealed, assigning and arguing that the trial court erred in denying plaintiff a divorce and other relief sought by her for the reason that the charges made by plaintiff were amply sustained by the evidence. We sustain the assignment.

It is now elementary that: "Actions in equity, on appeal to this court, are triable de novo, subject, however, to the rule that when credible evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." Wiskocil v. Kliment, 155 Neb. 103, 50 N. W. 2d 786. However, in that opinion we called attention to the fact, as we do here also, that: "* * * the version accepted must be supported by credible evidence."

There are other well-established rules which we should consider in disposing of the issues presented in this case. In that connection we recently reaffirmed in Workman v. Workman, 164 Neb. 642, 83 N. W. 2d 368, that: "Any unjustifiable conduct on the part of either the husband or wife, which so grievously wounds the mental feelings of the other, or so utterly destroys the peace of mind of the other, as to seriously impair

the bodily health and endanger the life of the other, or such as utterly destroys the legitimate ends and objects of matrimony, constitutes 'extreme cruelty' as defined in section 42-302, R. R. S. 1943."

We have also held that: "Where a husband, having sufficient ability, without just cause, fails and absolutely refuses to contribute anything to the support of his wife, the court may grant her a decree of divorce." Svanda v. Svanda, 93 Neb. 404, 140 N. W. 777, 47 L. R. A. N. S. 666.

In that connection, a wife is not prevented, for good cause shown, from having a domicile or residence separate and apart from that of her husband. Wray v. Wray, 149 Neb. 376, 31 N. W. 2d 228.

Also, in Price v. Price, 75 Neb. 552, 106 N. W. 657, this court held that: "It is the duty of the husband to provide for the reasonable support and maintenance of his wife during the continuance of the marriage relation; and, when the husband without just cause fails to provide for the support and maintenance of the wife, she may maintain an action against him for reasonable maintenance, unless by her own act of abandonment of the husband's domicile, or some other act wholly inconsistent with her duty as his wife, she has forfeited her right to such maintenance.

"To defeat a wife's claim for support and maintenance on the ground of voluntary abandonment of the husband's domicile, the fact of such abandonment must be established by cogent proof."

In Studley v. Studley, 129 Neb. 784, 263 N. W. 139, it was held, quoting from Peyton v. Peyton, 97 Neb. 663, 151 N. W. 150: " 'A court of equity will not grant a divorce to one whose conduct has been such as to furnish sufficient grounds for divorce, even if the conduct of the other party has been grossly more culpable. In such case the court will deny relief to either.' "

In Egbert v. Egbert, 149 Neb. 227, 30 N. W. 2d 669, after quoting from section 42-304, R. R. S. 1943, and cit-

ing authorities, this court held that: "Upon an application for a divorce where both parties are found guilty of any of the enumerated offenses for which a divorce may be granted, the court should dismiss the bill."

However, long ago this court held that: "Mere austerity of temper and petulance of manners of the wife are not sufficient to defeat a divorce on the ground of extreme cruelty of the husband by blows inflicted by him on her." Boeck v. Boeck, 16 Neb. 196, 20 N. W. 223.

Also, as recently as Stephens v. Stephens, 143 Neb. 711, 10 N. W. 2d 620, this court held that: "Misconduct on the part of the plaintiff in an action for divorce, not amounting to a statutory ground for divorce, affords no justification for punishment inflicted upon such plaintiff by the defendant in retaliation out of all proportion to such misconduct."

In Hefti v. Hefti, 166 Neb. 181, 88 N. W. 2d 231, we held that: "The granting of alimony and the allowance of support money in divorce actions are always determined by the facts and circumstances in each case relating to and in accord with the many factors and elements heretofore announced by this court."

In that connection, in Cowan v. Cowan, 160 Neb. 74, 69 N. W. 2d 300, we held that: "The amount of alimony to be granted a wife is not to be determined alone from the property possessed by the husband. Many other factors enter into the determination such as the husband's age, health, earning capacity, future prospects, and social standing."

Also, in Hodges v. Hodges, 154 Neb. 178, 47 N. W. 2d 361, we held: "The proper rule in a divorce case, where the custody of minor children is involved, is that the custody of the child is to be determined by the best interests of the child, with due regard for the superior rights of fit, proper, and suitable parents.

"In awarding the custody of minor children, the court looks to the best interests of such children, and those of tender age are usually awarded to the mother. Other

considerations being equal, it is usual to award the custody of children to the innocent spouse."

With regard to the support of minor children, this court concluded in Geary v. Geary, 102 Neb. 511, 167 N. W. 778, 20 A. L. R. 809, that: The fact that the marriage relation is dissolved does not relieve the father of the duty to support his minor children. See, also, section 42-311, R. R. S. 1943; York v. York, 138 Neb. 224, 292 N. W. 385; and Dier v. Dier, 141 Neb. 685, 4 N. W. 2d 731, which give authority and point out the factors or elements to be considered by the court in decreeing just and proper support and maintenance of minor children of the parties.

In the light of the foregoing rules, we have examined the record. As summarized, it discloses the following facts which were either without dispute or were adduced by plaintiff and amply corroborated by the two younger children of the parties, by a neighbor woman who had long been a friend of plaintiff, and by plaintiff's physician. At time of trial, plaintiff was 37 years old. The parties were married April 14, 1936. Three boys and one girl were issue of the marriage. The oldest son was 20 years old and self-supporting at time of trial. He had enlisted in the United States Air Force in Texas on April 4, 1955, when he was 17 years old. At that time he had refused to return to the family home and had so enlisted because of his father's abuse whether the boy was right or wrong and because he could not get along with his father. The next oldest son was 15 years old, the daughter was 14 years old, and the youngest son was 12 years old at time of trial.

The parties had lived on farms as tenants or employees before moving to Nebraska City on August 27, 1950. There they moved into a home which had just previously been purchased in the names of plaintiff and defendant. It had been purchased for $2,700 with cash accumulated during the marriage and a $1,200 mortgage loan. Sometime later the property was improved at a cost of about

$1,200. Both plaintiff and defendant had assisted in the purchase and improvements of the property. At time of trial there was a balance of about $400 still owing on the mortgage, which was payable $30 a month, and a balance of about $600 still owing on improvements, which was payable $42.61 a month. Both parties had helped make such payments and provide for the children as well until in August 1957, when plaintiff took the two youngest children and left the home, as commanded by defendant. In that connection, after August 1957, defendant made no effort to personally contact plaintiff, and from that time until ordered by the trial court to do so on January 25, 1958, defendant admittedly contributed nothing for the support and maintenance of plaintiff and the two youngest children.

At time of trial plaintiff was earning about $42 a week and defendant was earning about $50 to $60 a week. Each party then owned almost identical Chevrolet cars which were paid for. Also, the aforesaid home, purchased by the parties, was well furnished with good furniture and equipment which had been purchased by them. In that connection, when plaintiff left that home in August 1957, she took a few necessaries with her. They are of no consequence here.

The parties had been having marital difficulties of one kind or another for almost 10 years. They had more serious trouble during the last 5 years. Defendant was ill for a time with a blood clot at the back of his head. He was unable to work for some time and they had financial difficulties with family bills accumulating and accumulated, and they had no money to pay them. In that situation, plaintiff wanted to get employment as was required in order to provide for the family, but defendant objected on the ground that plaintiff should borrow the necessary money, telling her that she just wanted to get away from him. Nevertheless, plaintiff did obtain employment and provided for the family until defendant was able to work again. In that con-

nection, there was not then enough money available to meet family expenses, so plaintiff continued to work, and until August 1957, she helped make payments on the home and pay the family expenses.

In the meantime, after defendant's illness he recovered physically but gradually become sexually incompetent and the family relationship went from bad to worse. Defendant in that condition berated himself to himself and others in the home and elsewhere. He was violently critical of plaintiff on numerous occasions for making the children work around the home and for disciplining the children, which had to be done but defendant refused to do so. Without cause he accused plaintiff of abusing the children and told them they did not need to do what plaintiff told them to do.

Two or three times a week or oftener defendant would become angry and tell plaintiff she was no good; that she had no brains; and to get out of the house and stay out. Defendant used abusive and profane language to plaintiff and called her vile names in the presence of the children and others. Such language was too profane and vile to speak to anyone anywhere, and certainly too profane and vile to repeat here. Defendant himself testified that he didn't think he ever called plaintiff such names in the presence of the children, but he didn't know whether he did or not.

Defendant struck plaintiff in anger on two occasions. He slapped her once. He struck her with his fist and knocked her against a door which skinned her shoulder on another occasion. At another time he attempted to and admittedly did choke plaintiff. Once defendant made a suicide attempt. Plaintiff would awaken at night in fear because defendant would be standing in the door looking at her. He threatened plaintiff on many occasions until she became afraid. She became so nervous and emotionally upset during their quarrels and when defendant would tell her to get out that she would leave the house crying and go over to the home of

one or the other of two women friends. There she would pour out her troubles, or she would go uptown to drink a little to quiet her nerves until defendant had quieted down or retired, when she would return to their house. Several times defendant locked her out of the house and she had to awaken the family or even crawl through a window to get back into the house. Defendant objected to plaintiff inviting her women friends to their home for social gatherings. The few times that she did so, defendant sat staring, sullen and silent in their presence, and when they left he made uncomplimentary remarks about them, so plaintiff had no more such company.

Repeatedly defendant told plaintiff: " 'Somebody's going to get hurt. You just better watch out, somebody's going to get hurt.' " Defendant admittedly told plaintiff that, but testified that he meant some person other than plaintiff. Be that as it may, he also told plaintiff: " 'You are going to get hurt,' " and " '* * * I am going to choke you,' " which defendant admittedly did do.

Defendant told his youngest son to leave and get out. He repeated that just before plaintiff left, after defendant had repeatedly told plaintiff to get out, to stay out, and never come back. In that situation, plaintiff looked for an apartment so she could get out as he had demanded, but found no suitable apartment. However, in August 1957, plaintiff found a suitable house which rented for $40 a month. Plaintiff then moved into that house with the two youngest children, where plaintiff paid the rent and provided for herself and the two children. Such children had chosen to go with plaintiff, but the next oldest son had chosen to stay with his father in the family home. In that connection, as a witness called by his father, that son, who would never mind his mother, admitted that he saw his father angrily slap his mother once, but "Not too awful hard." However, he testified that they had arguments but he never heard his father call his mother names; that he never

heard him tell his mother and brother to leave; and that he never saw his mother leave crying, all of which was simply equivocal negative evidence and contrary to the positive testimony of his mother, his sister, and his brother, and was contrary in part to the positive testimony of another witness called by plaintiff.

As a result of their arguments and marital difficulties, plaintiff became so nervous, sleepless, and upset with emotional anxiety that she began taking aspirin, smoking cigarettes, and drinking a little, but never too much, in an effort to escape her anxiety. She consulted a physician who gave her shots in the arm and sedatives. In 1955 he advised her to get away to improve her condition, so she took the children and went to her brother's home in Texas where she stayed 6 weeks. Upon becoming somewhat improved, she returned with their children except the oldest 17-year old son who refused to return and joined the Air Force for reasons heretofore stated.

Upon her return, plaintiff immediately went back to work, but her nervousness and emotional anxiety became worse as her marital difficulties and arguments became more numerous. When that occurred and defendant told her to get out of the house she would again and again, from one to five times a week, leave and go nervous and crying to the homes of women friends and pour out her troubles. Once while at one of such homes she laid down to recuperate and went to sleep and didn't awaken until morning, which resulted in a violent angry quarrel and accusations by defendant.

Plaintiff and defendant worked different hours and at different places. Her work was farther away and they had trouble about meeting each other in going to and from work with one car, whereupon defendant would become angry and his usual abuse and accusations would follow. To avoid that difficulty, plaintiff bought a Chevrolet car for her own use in February 1956, but their troubles continued about its use and other matters.

Since leaving the home plaintiff has quit smoking, drinks but little, and her nervous condition and emotional anxiety have subsided. Plaintiff and the two younger children, who chose to live with plaintiff, are happy and for the first time they are at peace in their new home. Defendant himself admitted that their old home was never a happy one during the last few years and that the parties had marital difficulties over a long period of time.

Defendant repeatedly over the years has charged plaintiff with associating with other men, but strange as it may seem he testified that he wanted a reconciliation, although admittedly he had made no effort to obtain a reconciliation. As a matter of fact, he had not even talked with plaintiff since August 1957. At the trial, defendant testified that their troubles were caused by plaintiff staying out late at night and associating with other men, and that he had seen plaintiff with other men a half dozen times. He named six such men but gave no evidence of where or when he saw them, or what they were doing, or that plaintiff had been guilty of any misconduct with them. Defendant's general theory was that if plaintiff was in a tavern with women friends where men were present, or was in a place of business where there were other men, that plaintiff was associating with such men. One such man was the party who delivered fuel oil to their home at required intervals as long ago as 1951. On one other occasion, he had stopped at their home to borrow a spade and on another he had stopped to borrow a chain while plaintiff and the children were there. Another party was foreman at the place where plaintiff had worked. Another was the foreman where she worked at time of trial. That person also owned the home rented by plaintiff. He was the husband of one of plaintiff's best friends with whom she often consulted about her marital difficulties, and who informed plaintiff that the house could be rented by her. Another such party was at their

home on occasions because his family and the parties herein had been close personal and social friends. Admittedly, defendant himself had once asked such man to take plaintiff home and he did so. In that connection, the chief of police testified as a witness for defendant that on January 26, 1957, at 11:55 p. m., he saw plaintiff in the company of that man driving along the streets of Nebraska City, and that at another unspecified time he saw plaintiff stop her car, whereupon another named man got in and they drove on. He also testified that he had seen plaintiff driving her car around town alone late at night, but he had also seen other women doing so. He had also seen plaintiff in the bank and the store buying groceries, but he had never seen plaintiff in a tavern.

Neither the chief of police nor any other witness testified that plaintiff had been guilty of any specific misconduct, or that she was not a good woman or mother, or that she was unfit to have the custody of their children. As a matter of fact, there is ample evidence that plaintiff was a good woman and mother who was fit to have their custody. Simply being seen in a place of business where other men were present, or simply driving her car with a man other than her husband in it, or riding in a car driven by a man other than her husband, cannot be said under the evidence in this case to be misconduct. As a matter of course, we are not convinced that plaintiff was guilty of any misconduct under the circumstances appearing in this record. Evidently defendant simply had an unjustifiable suspicion that plaintiff was guilty of some misconduct which caused him to be inexcusably and unjustifiably guilty of extreme cruelty to plaintiff. The evidence in this record is wholly insufficient to support defendant's contentions or to sustain the judgment of the trial court on any theory. Rather, the evidence overwhelmingly supports plaintiff's contentions and sustains her right to the relief sought by her. We are convinced that the object

of this marriage has been destroyed beyond repair by defendant's own inexcusable and unjustifiable conduct.

For reasons heretofore stated we conclude that the judgment of the trial court should be and hereby is reversed and the cause is remanded with directions to grant plaintiff an absolute divorce and award her the custody, care, and control of the two youngest children with right of reasonable visitation by defendant, together with an allowance of $10 a week to be paid to the clerk of the district court by defendant for their maintenance and support until each and both children reach their majority or are self-supporting. The custody of the next oldest son, now 16 years old, who has chosen to stay with defendant, shall be awarded to defendant with right of reasonable visitation by plaintiff and the other children. Plaintiff shall also be awarded absolutely all the furniture and household equipment now in the home owned by plaintiff and defendant, and plaintiff shall be immediately awarded the exclusive possession and use of the home now owned by plaintiff and defendant for the use and benefit of plaintiff and the two youngest children until the majority of each and both of them, or until they are self-supporting, or until plaintiff remarries. Upon the happening of any such event, their said home, unless theretofore disposed of by agreement of the parties, shall be sold at the best price obtainable and the proceeds therefrom divided equally between plaintiff and defendant. In the meantime, defendant shall each month when due timely pay to the clerk of the district court for plaintiff's benefit $36.31, which is one-half of the respective monthly balances of $30 due on the home loan and one-half of the respective monthly balances of $42.61 due on the improvements thereof, until all said monthly balances due are paid in full. In that connection, plaintiff shall collect from the clerk of the district court such respective payments aforesaid ordered paid by defendant to the clerk of the district court, then timely add thereto

the other respective one-halves or $36.31 which plaintiff shall be required to pay out of her own funds, and remit the full monthly balances so paid each month to the respective mortgagee of the loan on their home and creditors who furnished the improvements, until all the monthly payments due are paid in full. All costs, including an additional allowance of $350 as attorneys' fees for the services of plaintiff's attorneys in the district court and this court, shall be and are taxed to defendant.

REVERSED AND REMANDED WITH DIRECTIONS.